4/30/2021 10:42:06 AM

# Compare Results

| Old File: | | New File: |
|---|---|---|
| **19-863.pdf** | versus | **19-863_new.pdf** |
| **41 pages (203 KB)** | | **41 pages (202 KB)** |
| 4/27/2021 2:37:41 PM | | 4/30/2021 10:38:00 AM |

**Total Changes**

**1**

**Content**

1   Replacement

0   Insertions

0   Deletions

**Styling and Annotations**

0   Styling

0   Annotations

Go to First Change (page 17)

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NIZ-CHAVEZ *v.* GARLAND, ATTORNEY GENERAL

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 19–863. Argued November 9, 2020—Decided April 29, 2021

Nonpermanent resident aliens ordered removed from the United States under federal immigration law may be eligible for discretionary relief if, among other things, they can establish their continuous presence in the country for at least 10 years. 8 U. S. C. §1229b(b)(1). But the so-called stop-time rule included in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) provides that the period of continuous presence "shall be deemed to end . . . when the alien is served a notice to appear" in a removal proceeding under §1229a. §1229b(d)(1). The term "notice to appear" is defined as "written notice . . . specifying" certain information, such as the charges against the alien and the time and place at which the removal proceedings will be held. §1229(a)(1). A notice that omits any of this statutorily required information does not trigger the stop-time rule. See *Pereira* v. *Sessions*, 585 U. S. ___. Here, the government ordered the removal of petitioner Agusto Niz-Chavez and sent him a document containing the charges against him. Two months later, it sent a second document, providing Mr. Niz-Chavez with the time and place of his hearing. The government contends that because the two documents collectively specified all statutorily required information for "a notice to appear," Mr. Niz-Chavez's continuous presence in the country stopped when he was served with the second document.

*Held*: A notice to appear sufficient to trigger the IIRIRA's stop-time rule is a single document containing all the information about an individual's removal hearing specified in §1229(a)(1). Pp. 4–12.

(a) Section 1229b(d)(1) states that the stop-time rule is triggered by serving "a notice," and §1229(a)(1) explains that "written notice" is "referred to as a 'notice to appear.'" Congress's decision to use the indefinite article "a" suggests it envisioned "a" single notice provided at a

discrete time rather than a series of notices that collectively provide the required information.  While the indefinite article "a" can sometimes be read to permit multiple installments (such as "a manuscript" delivered over months), that is not true for words like "notice" that can refer to either a countable object ("a notice") or a noncountable abstraction ("sufficient notice").  The inclusion of an indefinite article suggests Congress used "notice" in its countable sense.  More broadly, Congress has used indefinite articles to describe other case-initiating pleadings—such as an indictment, an information, or a civil complaint, see, *e.g.,* Fed. Rules Crim. Proc. 7(a), (c)(1), (e); Fed. Rule Civ. Proc. 3—and none suggest those documents might be delivered by installment.  Nor does the Dictionary Act aid the government, as that provision merely tells readers of the U. S. Code to assume "words importing the singular include and apply to several persons, parties, or things."  1 U. S. C. §1.  That provision means only that terms describing a single thing ("a notice") can apply to more than one of that thing ("ten notices").  While it certainly allows the government to send multiple notices to appear to multiple people, it does not mean a notice to appear can consist of multiple documents.  Pp. 4–9.

(b) The IIRIRA's structure and history support requiring the government to issue a single notice containing all the required information.  Two related provisions, §§1229(e)(1) and 1229a(b)(7), both use a definite article with a singular noun ("the notice") when referring to the government's charging document—a combination that again suggests a discrete document.  Another provision, §1229(a)(2)(A), requires "a written notice" when the government wishes to change an alien's hearing date.  The government does not argue that this provision contemplates providing "the new time or place of the proceedings" and the "consequences . . . of failing . . . to attend such proceedings" in separate documents.  Yet the government fails to explain why "a notice to appear" should operate differently.  Finally, the predecessor to today's "notice to appear" required the government to specify the place and time for the alien's hearing "in the order to show cause or otherwise."  §1252(a)(2)(A).  The phrase "or otherwise" has since disappeared, further suggesting that the required details must be included upfront to invoke the stop-time rule.  Indeed, that is how the government itself initially read the statute.  The year after Congress adopted IIRIRA, in the preamble to a proposed rule implementing these provisions, the government acknowledged that "the language of the amended Act indicat[es] that the time and place of the hearing must be on the Notice to Appear."  62 Fed. Reg. 449 (1997).  Pp. 9–13.

(c) The government claims that not knowing hearing officers' availability when it initiates removal proceedings makes it difficult to pro-

duce compliant notices. It also claims that it makes little sense to require time and place information in a notice to appear when that information may be later changed. Besides, the government stresses, its own administrative regulations have always authorized its current practice. But on the government's account, it would be free to send a person who is not from this country—someone who may be unfamiliar with English and the habits of American bureaucracies—a series of letters over the course of weeks, months, maybe years, each containing a new morsel of vital information. Congress could reasonably have wished to foreclose that possibility. And ultimately, pleas of administrative inconvenience never "justify departing from the statute's clear text." *Pereira*, 585 U. S., at \_\_\_. The modest threshold Congress provided to invoke the stop-time rule is clear from the text and must be complied with here. Pp. 13–16.

789 Fed. Appx. 523, reversed.

GORSUCH, J., delivered the opinion of the Court, in which THOMAS, BREYER, SOTOMAYOR, KAGAN, and BARRETT, JJ., joined. KAVANAUGH, J., filed a dissenting opinion, in which ROBERTS, C. J., and ALITO, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

No. 19–863

---

## AGUSTO NIZ-CHAVEZ, PETITIONER *v.* MERRICK B. GARLAND, ATTORNEY GENERAL

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[April 29, 2021]

JUSTICE GORSUCH delivered the opinion of the Court.

Anyone who has applied for a passport, filed for Social Security benefits, or sought a license understands the government's affinity for forms. Make a mistake or skip a page? Go back and try again, sometimes with a penalty for the trouble. But it turns out the federal government finds some of its forms frustrating too. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), 110 Stat. 3009–546, requires the government to serve "a notice to appear" on individuals it wishes to remove from this country. At first blush, a notice to appear might seem to be just that—a single document containing all the information an individual needs to know about his removal hearing. But, the government says, supplying so much information in a single form is too taxing. It needs more flexibility, allowing its officials to provide information in separate mailings (as many as they wish) over time (as long as they find convenient). The question for us is whether the law Congress adopted tolerates the government's preferred practice.

## I

For more than a century, Congress has afforded the Attorney General (or other executive officials) discretion to allow otherwise removable aliens to remain in the country. An alien seeking to establish his eligibility for that kind of discretionary relief, however, must demonstrate a number of things. A nonpermanent resident, for example, must show that his removal would cause an "exceptional and extremely unusual hardship" to close relatives who are U. S. citizens or lawful permanent residents; that he is of good moral character; that he has not been convicted of certain crimes; and that he has been continuously present in the country for at least 10 years. 8 U. S. C. §1229b(b)(1).

The last item on this list lies at the crux of this case. Originally, an alien continued to accrue time toward the presence requirement during the pendency of his removal proceedings. With time, though, some came to question this practice, arguing that it gave immigrants an undue incentive to delay things. See, *e.g.*, *In re Cisneros-Gonzales*, 23 I. & N. Dec. 668, 670–671 (BIA 2004). In IIRIRA, Congress responded to these concerns with a new "stop-time" rule. Under the statute's terms, "any period of continuous . . . presence in the United States shall be deemed to end . . . when the alien is served a notice to appear." §1229b(d)(1).

All of which invites the question: What qualifies as a notice to appear sufficient to trigger the stop-time rule? IIRIRA defines a notice to appear as "written notice . . . specifying" several things. §1229(a)(1). These include the nature of the proceedings against the alien, the legal authority for the proceedings, the charges against the alien, the fact that the alien may be represented by counsel, the time and place at which the proceedings will be held, and the consequences of failing to appear. See *ibid.*

This seemingly simple rule has generated outsized controversy. Initially, the dispute focused on the government's

practice of issuing documents labeled notices to appear that failed to include the time and place for the alien's removal hearing. The government argued these documents were sufficient to trigger the stop-time rule. It insisted that proceeding this way served an important governmental interest too: If it waited to issue notices until the calendars of its hearing officers became clear, aliens would accrue too much time toward the presence requirement. Ultimately, however, this Court rejected the government's practice in *Pereira* v. *Sessions*, 585 U. S. ___ (2018). We explained that, in IIRIRA, Congress took pains to describe exactly what the government had to include in a notice to appear, and that the time and place of the hearing were among them. *Id.*, at ___. The government was not free to short-circuit the stop-time rule by sending notices to appear that omitted statutorily required information. *Id.*, at ___.

Today's case represents the next chapter in the same story. Perhaps the government could have responded to *Pereira* by issuing notices to appear with all the information §1229(a)(1) requires—and then amending the time or place information if circumstances required it. After all, in the very next statutory subsection, §1229(a)(2), Congress expressly contemplated that possibility. But, at least in cases like ours, it seems the government has chosen instead to continue down the same old path. Here, the government sent Mr. Niz-Chavez one document containing the charges against him. Then, two months later, it sent a second document with the time and place of his hearing. In light of *Pereira*, the government now concedes the first document isn't enough to trigger the stop-time rule. Still, the government submits, the second document does the trick. On its view, a "notice to appear" is complete and the stop-time rule kicks in whenever it finishes delivering all the statutorily prescribed information. The government says it needs this kind of flexibility to send information piecemeal. It even

suggests it should be allowed to spread the statutorily man-
dated information over as many documents and as much
time as it wishes.

Some circuits have accepted the government's notice-by-
installment theory. Others, however, have held that the
government must issue a single and comprehensive notice
before it can trigger the stop-time rule. We agreed to hear
this case, *Niz-Chavez* v. *Barr*, 789 Fed. Appx. 523 (CA6
2019), to resolve the conflict, 590 U. S. ___ (2020).

## II

When called on to resolve a dispute over a statute's mean-
ing, this Court normally seeks to afford the law's terms
their ordinary meaning at the time Congress adopted them.
See, *e.g.*, *Wisconsin Central Ltd.* v. *United States*, 585 U. S.
___, ___ (2018). The people who come before us are entitled,
as well, to have independent judges exhaust "all the textual
and structural clues" bearing on that meaning. *Id.*, at ___
(slip op., at 8). When exhausting those clues enables us to
resolve the interpretive question put to us, our "sole func-
tion" is to apply the law as we find it, *Lamie* v. *United States
Trustee*, 540 U. S. 526, 534 (2004) (internal quotation
marks omitted), not defer to some conflicting reading the
government might advance.

## A

In this case, our interpretive task begins with two statu-
tory provisions we have already touched on. The first,
§1229b(d)(1), states that the stop-time rule is triggered
"when the alien is served a notice to appear under section
1229(a)." In turn, §1229(a)(1) explains that "written notice
(in this section referred to as a 'notice to appear') shall be
given . . . to the alien . . . specifying" the time and place of
his hearing and all the other items we noted above. Almost
immediately, these provisions pose the government with a
problem. To trigger the stop-time rule, the government

must serve "a" notice containing all the information Congress has specified. To an ordinary reader—both in 1996 and today—"a" notice would seem to suggest just that: "a" single document containing the required information, not a mishmash of pieces with some assembly required.

Nor is the government's response (echoed by the dissent) entirely satisfying. The government submits that §1229(a)(1) defines the term "notice to appear" as "written notice"—and then says it's obvious "written notice" can come by means of one document or many. See *post,* at 6–7 (opinion of KAVANAUGH, J.). But this argument doesn't quite track. Section 1229(a)(1) says that "written notice" is "referred to as a 'notice to appear.'" The singular article "a" thus falls outside the defined term ("notice to appear") and modifies the entire definition. So even if we were to do exactly as the government suggests and substitute "written notice" for "notice to appear," the law would still stubbornly require "a" written notice containing all the required information.

Admittedly, a lot here turns on a small word. In the view of some, too much. The dissent urges us to overlook the fact Congress placed the singular article "a" *outside* the defined term in §1229(a)(1). On its view, we should read the statute as if the article came *inside* the defined term. *Post*, at 7–8. But that's not how the law is written, and the dissent never explains what authority might allow us to undertake the statutory rearranging it advocates.[1] Nor does any of this

_____

[1] The closest the dissent comes is when it alludes to *United States Nat. Bank of Ore.* v. *Independent Ins. Agents of America, Inc.*, 508 U. S. 439 (1993). But that "unusual" case turned on the "scrivener's error" doctrine, *id.*, at 462, which applies only in exceptional circumstances to obvious technical drafting errors. See, *e.g., Lamie* v. *United States Trustee*, 540 U. S. 526, 538 (2004); A. Scalia & B. Garner, Reading Law 237–238 (2012). Nobody (the dissent included) contends the conditions required for that doctrine's application exist here.

help when it comes to §1229b(d)(1), the provision that actually creates the stop-time rule, for that statute separately speaks of "a" notice to appear.  Not once but twice it seems Congress contemplated "a" single document.

Perhaps recognizing this much, the government and dissent pivot and focus their efforts in a different direction.  Now, they remind us that "[t]he indefinite article 'a' is often used to refer to something that may be provided in more than one installment."  Brief in Opposition 10; see also *post*, at 10–11.  The government observes, for example, that a writer can publish "a" story serially, or an author may deliver "a" manuscript chapter by chapter.  Brief in Opposition 10.  The dissent offers its own illustrations, highlighting that "a job application" and "a contract" also can be prepared in parts.  *Post,* at 10.  So even if IIRIRA speaks repeatedly of "a" notice to appear, the government and dissent contend, it remains possible that Congress meant to allow that notice to come over time and in pieces.

The trouble with this response is that everyone admits language doesn't always work this way.  To build on an illustration we used in *Pereira*, someone who agrees to buy "a car" would hardly expect to receive the chassis today, wheels next week, and an engine to follow.  585 U. S., at ___ (slip op., at 14); see *post*, at 10.  At best, then, all of the competing examples the government and dissent supply do no more than demonstrate context matters.  And here at least, it turns out that context does little to alter first impressions.

Start with customary usage.  Normally, indefinite articles (like "a" or "an") precede *countable* nouns.  The examples above illustrate the point:  While you might say "she wrote a manuscript" or "he sent three job applications," no one would say "she wrote manuscript" or "he sent job application."  See The Chicago Manual of Style §5.7, p. 227 (17th ed. 2017); see also R. Huddleston & G. Pullum, The Cambridge Grammar of the English Language §3.1, p. 334

(2002).　By contrast, *noncountable* nouns—including abstractions like "cowardice" or "fun"—"almost never take indefinite articles."　The Chicago Manual of Style §5.7, at 227; see also Huddleston, *supra*, §3.1, at 334.　After all, few would speak of "a cowardice" or "three funs."

These customs matter because the key term before us (notice) can refer to *either* a countable object ("a notice," "three notices") *or* a noncountable abstraction ("sufficient notice," "proper notice").　Congress's decision to use the indefinite article "a" thus supplies some evidence that it used the term in the first of these senses—as a discrete, countable thing. All of which suggests that the government must issue a single statutorily compliant document to trigger the stop-time rule.　If IIRIRA had meant to endow the government with the flexibility it supposes, we would have expected the law to use "notice" in its noncountable sense.　A statute like that would have said the stop-time rule applies after the government provides "notice" (or perhaps "sufficient notice") of the mandated information—indicating an indifference about whether notice should come all at once or by installment.

Of course this is just a clue.　Sometimes Congress's statutes stray a good way from ordinary English.　Sometimes, too, Congress chooses to endow seemingly familiar words with specialized definitions.　But until and unless someone points to evidence suggesting otherwise, affected individuals and courts alike are entitled to assume statutory terms bear their ordinary meaning.　And when it comes to discerning the ordinary meaning of words, there are perhaps few better places to start than the rules governing their usage.

Nor is this the only contextual clue before us.　A notice to appear serves as the basis for commencing a grave legal proceeding.　As the government has acknowledged, it is "like an indictment in a criminal case [or] a complaint in a civil case."　Tr. of Oral Arg. in *Pereira* v. *Sessions*, O. T. 2017, No. 17–459, p. 39.　The rules Congress has adopted to describe those other case-initiating pleadings often use the

indefinite article to refer to a single document—an indict-
ment, an information, or a civil complaint. See, *e.g.*, Fed.
Rules Crim. Proc. 7(a), (c)(1), (e); Fed. Rule Civ. Proc. 3.  In
each case, the aim is to supply an affected party with a sin-
gle document highlighting certain salient features of the
proceedings against him.  No one contends those documents
may be shattered into bits, so that the government might,
for example, charge a defendant in "an indictment" issued
piece by piece over months or years.  And it is unclear why
we should suppose Congress meant for *this* case-initiating
document to be different.[2]

The government resists this conclusion by invoking the
Dictionary Act.  When reading the U. S. Code, that Act tells
us to assume "words importing the singular include and
apply to several persons, parties, or things," unless statu-
tory context indicates otherwise.  1 U. S. C. §1.  But this
instruction has no application here.  The Dictionary Act
does not transform every use of the singular "a" into the
plural "several."  Instead, it tells us only that a statute us-
ing the singular "a" can apply to multiple persons, parties,
or things.  So the Act allows the government to send multi-
ple notices to appear to multiple people, but it does not
mean a notice to appear can consist of multiple documents.

Think of the problem this way:  Suppose a statute made
it a crime to vandalize "a" bank.  Under the Dictionary Act,
someone who vandalizes five banks could not avoid prose-
cution on the ground that he vandalized more than one.
Now take a hypothetical closer to this case—a person who

---

[2] The question is not, as the dissent seems to think, whether certain
other charging documents do or do not require "calendaring" infor-
mation.  *Post,* at 11.  Instead, our point is that each case-initiating docu-
ment must contain the catalogue of information Congress has said the
defendant or respondent is entitled to receive in that document—and no
one thinks this information may be provided by installment.  Nor does
anyone dispute that Congress has said *this* case-initiating document
must include (among other things) "[t]he time and place at which the
proceedings will be held."  8 U. S. C. §1229(a)(1)(G)(i).

vandalizes some constituent part of a not-yet-completed bank (say, a stack of blocks on a construction site). Did he vandalize "a" bank? Answering that question depends on whether Congress defined "bank" to include its constituent parts, not on what the Dictionary Act says about the word "a."

B

To the extent any doubt remains about the meaning of the two specific statutes before us, we believe a wider look at IIRIRA's statutory structure and history enough to resolve it.

Take 8 U. S. C. §1229(e)(1). That nearby provision sets forth special rules the government must follow when it seizes an alien at a sensitive location like a domestic violence shelter. In circumstances like these, Congress has instructed, "*the* Notice to Appear shall include a statement that" the government has complied with certain special requirements. *Ibid.* (emphasis added). Here again we encounter an article coupled with a singular noun ("the Notice"), a combination that once more seems to suggest a discrete document. Nor would the rest of §1229(e)(1)'s terms make much sense on the government's account. If a notice to appear were a collection of information rather than a single written instrument, Congress would have had no need to insist on "includ[ing]" a particular statement in "the Notice to Appear." *Ibid.* More simply, it could have required the government to provide the information, full stop.

Once more, too, the government's response is less than satisfying. It suggests that the "Notice to Appear" discussed in §1229(e)(1) isn't the same "notice to appear" described in §1229(a)(1). No, the government says, by using capital letters in §1229(e)(1) Congress sought to prescribe only what must be included in a Department of Homeland Security form entitled "Notice to Appear." But that much

is hard to see.  Section 1229(e)(1)'s discussion about what
must be included in a notice to appear resides just a couple
doors down from the provisions at issue before us, and it
seems pretty clearly to modify those provisions in certain
special circumstances.  Meanwhile, the Department of
Homeland Security form exists only by regulation and the
department can change that regulation any time.  Maybe,
too, there is another explanation for the capital letters.
Maybe they simply reflect how clear it was by the time Con-
gress added §1229(e)(1) in 2006—a decade after IIRIRA's
adoption—that a notice to appear *is* a specific document in
which the government can (and must) "include" the re-
quired certification.[3]

  Next comes §1229a(b)(7).  It states that an alien who fails
to appear for his removal proceedings is typically ineligible
for relief if, "at the time of the notice described in paragraph
(1) or (2) of section 1229(a)," the government supplies oral
as well as written notice of the time and place of the re-
moval proceedings and the consequences of failing to ap-
pear.  §1229a(b)(7).  Again, the law seems to speak of the
charging document as a discrete thing, using a definite ar-
ticle with a singular noun ("the notice").  And by speaking
of "the notice" being served at a particular "time" the stat-
ute seems to equate service with a discrete moment, not an
ongoing endeavor.  To be sure, one could reply (as the gov-
ernment and dissent do) that "the time of the notice" refers
to the moment when the final installment arrives.  See *post,*
at 13–14.  But if that's what Congress meant, this was

———————————
  [3] Even the dissent declines to endorse the government's interpretation
of §1229(e)(1).  Instead, it merely repeats the anodyne point that singular
articles are sometimes used "with a thing delivered in constituent in-
stallments."  *Post*, at 14.  But that observation cuts little ice in this con-
text for reasons we've already explored in Part II–A, *supra*.  The dissent
also fails to explain why Congress would have gone to the trouble of in-
sisting in §1229(e)(1) that "the Notice to Appear" contain additional in-
formation if it really meant only to require the government to provide
that information whenever and however it pleases.

surely an awkward way of saying so.

Section 1229(a)(2) adds to the government's growing list of problems. That provision applies when officials wish to change the alien's hearing date. It requires the government to serve "*a* written notice" specifying "the new time or place of the proceedings" and the "consequences . . . of failing . . . to attend such proceedings." §1229(a)(2)(A) (emphasis added). The government does not argue *this* statute contemplates multiple documents. And if that's the case—if §1229(a)(2) anticipates a single document—it's not exactly obvious why the phrase "a notice to appear" found next door in §1229(a)(1) should operate differently.[4]

Finally, there is the statute's history and the government's initial response to it. Before IIRIRA, the government began removal proceedings by issuing an "order to show cause"—the predecessor of today's "notice to appear." Back then, the law expressly authorized the government to specify the place and time for an alien's hearing "in the order to show cause *or otherwise.*" §1252b(a)(2)(A) (1994 ed.) (emphasis added). IIRIRA changed all that. It changed the name of the charging document—and it changed the rules governing the document's contents. Now time and place information must be included in a notice to appear, not "or otherwise." Nor was the alteration an insensible one. Recall that IIRIRA *also* created the stop-time rule and pegged it to the service of a notice to appear. A rational Congress easily could have thought that measuring an alien's period of residence against the service date of a discrete document

---

[4] The dissent seeks to raise the cudgel on the government's behalf, arguing that §1229(a)(2) *does* permit multiple documents. *Post*, at 14-15. But on the dissent's reading, the statute would authorize the government to (1) hand an alien one document with a new time for his hearing, (2) follow up at its leisure with a second document containing the new hearing date, and (3) add a third document later still explaining the consequences of failing to appear. To state the theory may be enough to explain why the government declines to press it.

was preferable to trying to measure it against a constellation of moving pieces.

Notably, too, the year after Congress adopted IIRIRA the government proposed a rule to create "the Notice to Appear, Form I–862, replacing the Order to Show Cause, Form I–221." See 62 Fed. Reg. 449 (1997). In the preamble to its proposed rule, the government expressly acknowledged that "the language of the amended Act indicat[es] that *the time and place of the hearing must be on the Notice to Appear*." *Ibid.* (emphasis added). We don't mention this, as the dissent supposes, in support of some argument that "post-enactment regulatory history" should overcome "the otherwise-best interpretation of the statute." *Post*, at 16. Rather, we mention it only to observe that even the party now urging otherwise once read the statute just as we do. To the extent that dissent accuses us of being "literalists," it seems the literalists once infiltrated the Executive Branch too. *Post,* at 10.[5]

Perhaps, though, what's really going on here has nothing to do with labels like that. Perhaps there's a simpler explanation. Perhaps when Congress adopted IIRIRA everyone understood that it required a single fully compliant document to trigger the stop-time rule. Perhaps the government has resisted the law's demands only because they leave its officials with less flexibility than they once had. Regardless, when interpreting this or any statute, we do not aim for "literal" interpretations, but neither do we seek to indulge efforts to endow the Executive Branch with maximum bureaucratic flexibility. We simply seek the law's ordinary meaning. Today, a long parade of textual and contextual clues persuade us of this statute's ordinary

---

[5] It makes no difference either that the Executive Branch tempered its candor by promising later in its proposed rule to provide a single notice only "where practicable." *Post,* at 16. That the government let slip (at least once) that it understood the plain import of IIRIRA's revisions remains telling.

meaning. If, in the process of discerning that meaning, we happen to consult grammar and dictionary definitions— along with statutory structure and history—we do so because the rules that govern language often inform how ordinary people understand the rules that govern them.

### III

Ultimately, the government is forced to abandon any pretense of interpreting the statute's terms and retreat to policy arguments and pleas for deference. The government admits that producing compliant notices has proved taxing over time. It may not know the availability of hearing officers' schedules at the time it would prefer to initiate proceedings against aliens. Nor, the government contends, does it make sense to include time and place information in a notice to appear when the statute allows it to amend the time and place by serving a supplemental notice. Beyond all that, the government stresses, its own (current) regulations authorize its practice. The dissent expands on all these points at length. *Post,* at 17–21. But as this Court has long made plain, pleas of administrative inconvenience and self-serving regulations never "justify departing from the statute's clear text." *Pereira*, 585 U. S., at ___ (slip op., at 18).

Besides, even viewed in isolation the government's policy arguments are hardly unassailable. If the government finds filling out forms a chore, it has good company. The world is awash in forms, and rarely do agencies afford individuals the same latitude in completing them that the government seeks for itself today. Take this example: Asylum applicants must use a 12-page form and comply with 14 single-spaced pages of instructions. Failure to do so properly risks having an application returned, losing any chance of relief, or even criminal penalties. DHS, I–589, Application for Asylum and for Withholding of Removal: Instructions, pp. 5, 14; DHS, I–589 Form. Nor is it obvious

the government faces an insurmountable chore here. As we have seen, once the government serves a compliant notice to appear, IIRIRA permits it to send a supplemental notice amending the time and place of an alien's hearing if logistics require a change. See 8 U. S. C. §1229(a)(2).

To be sure, the government seeks to leverage this statutory feature to its further advantage. Because it may issue a supplemental notice changing the time and place of the alien's hearing, the government reasons, requiring an initial and fully compliant notice serves no meaningful purpose. But that much does not follow. True, the government can change the time and place if it must. As written, though, the statute allows the government to invoke the stop-time rule only if it furnishes the alien with a single compliant document explaining what it intends to do and when. We are no more entitled to denigrate this modest statutory promise as some empty formality than we might dismiss as pointless the rules and statutes governing the contents of civil complaints or criminal indictments.

Just consider the alternative. On the government's account, it would be free to send a person who is not from this country—someone who may be unfamiliar with English and the habits of American bureaucracies—a series of letters. These might trail in over the course of weeks, months, maybe years, each containing a new morsel of vital information. All of which the individual alien would have to save and compile in order to prepare for a removal hearing. And as soon as the last letter arrives, the alien's ability to accrue time toward the residency requirement would be suspended indefinitely. Nor is this a wild hypothetical. At oral argument the government contended "[t]here's nothing that textually limits us" from proceeding in just this fashion. Tr. of Oral Arg. 47.

The dissent's policy arguments stretch even further than the government's. It suggests that the best way to help aliens is to rule against the alien before us. *Post*, at 4–5, 17–

21. Unsurprisingly, however, neither Mr. Niz-Chavez nor any of the immigration policy advocates who have filed *amicus* briefs in this Court share that assessment. And how does the dissent arrive at its judgment anyway? It speculates the government might respond to our decision by disadvantaging aliens in one of two ways. First, it might ambush aliens with last-minute notices. See *post*, at 19. Alternatively, it might issue compliant notices that trigger the stop-time rule as early as possible, only to amend the time-and-place information shortly before the hearing date. *Ibid.* But the dissent's preferred construction does nothing to foreclose either of these possibilities. And even the dissent seems to think another outcome is more likely yet: It says the government may continue serving notices without time and place information in the first instance, only to trigger the stop-time rule later by providing fully compliant notices with time and place information once a hearing date is available. *Post*, at 18. Nor does the dissent question that this result would help—and certainly not hurt—most aliens.

In the end, though, all this speculation is beside the point. The dissent tries to predict how the government will react to a ruling that requires it to follow the law and then proceeds to assess the resulting "costs" and "benefits." *Post*, at 17, 20–21. But that kind of raw consequentialist calculation plays no role in our decision. Instead, when it comes to the policy arguments championed by the parties and the dissent alike, our points are simple: As usual, there are (at least) two sides to the policy questions before us; a rational Congress could reach the policy judgment the statutory text suggests it did; and no amount of policy-talk can overcome a plain statutory command. Our only job today is to give the law's terms their ordinary meaning and, in that small way, ensure the federal government does not exceed its statutory license. Interpreting the phrase "a notice to ap-

pear" to require a single notice—rather than 2 or 20 documents—does just that.

*

At one level, today's dispute may seem semantic, focused on a single word, a small one at that. But words are how the law constrains power. In this case, the law's terms ensure that, when the federal government seeks a procedural advantage against an individual, it will at least supply him with a single and reasonably comprehensive statement of the nature of the proceedings against him. If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them.

The judgment of the Court of Appeals for the Sixth Circuit is

*Reversed.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 19–863

_____

## AGUSTO NIZ-CHAVEZ, PETITIONER *v.* MERRICK B. GARLAND, ATTORNEY GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[April 29, 2021]

JUSTICE KAVANAUGH, with whom THE CHIEF JUSTICE and JUSTICE ALITO join, dissenting.

Agusto Niz-Chavez is a native and citizen of Guatemala. In 2005, Niz-Chavez unlawfully entered the United States through the southern border and eventually settled in Detroit. In 2013, the Government initiated removal proceedings against Niz-Chavez. After the removal hearings, an Immigration Judge ordered Niz-Chavez to either voluntarily depart from the United States within 30 days or else be removed to Guatemala.

The Court today casts aside the Immigration Judge's order and allows Niz-Chavez to go back to immigration court to seek cancellation of removal. Why? The Court says that Niz-Chavez did not receive proper notice of his removal proceedings because he received notice in two documents rather than one. The Court so holds even though Niz-Chavez (i) received all the statutorily required information about his removal proceedings, including the time and place of the removal hearing; (ii) was not prejudiced in any way by receiving notice in two documents rather than one; and (iii) in fact appeared with counsel at his scheduled removal hearing.

The Court's decision contravenes Congress's detailed requirements for a noncitizen to obtain cancellation of removal. When the Government seeks to remove a noncitizen

such as Niz-Chavez who is unlawfully in the country, it begins the process by sending the noncitizen a notice to appear for removal proceedings.  8 U. S. C. §1229(a)(1).  In the subsequent removal proceedings before an immigration judge, the noncitizen may contest the grounds for removal and may also ask the immigration judge to grant various forms of relief, including discretionary cancellation of removal.  §§1229b(a), (b)(1).

A noncitizen's eligibility for cancellation of removal depends in part on when the noncitizen received notice of the removal proceeding.  To be eligible, a noncitizen who is a nonpermanent resident must have been continuously present in the United States for at least 10 years.  §1229b(b)(1)(A).  The 10-year clock stops, however, when the noncitizen is served "a notice to appear" for the removal proceeding.  §1229b(d)(1).

Because service of a notice to appear stops the 10-year clock and may make the noncitizen ineligible for cancellation of removal, noncitizens who want to apply for cancellation of removal (and courts) must know what constitutes a notice to appear.  Federal immigration law answers that question.  The relevant statute defines a notice to appear as "written notice," which must be served in person or by mail and which provides certain required information, such as the alleged grounds for removal and the time and place of the removal hearing.  §1229(a)(1); see *Pereira* v. *Sessions*, 585 U. S. \_\_\_, \_\_\_–\_\_\_  (2018) (slip op., at 13–14) (§1229(a)(1) provides the definition of a notice to appear for purposes of the 10-year clock).

In this case, the United States commenced removal proceedings against Niz-Chavez in 2013—eight years after he entered the United States.  The Government served two documents on Niz-Chavez.  In March 2013, Niz-Chavez received the first document, which notified him that he was being charged as removable because he was unlawfully in the country.  It explained that he would have to appear for

a removal hearing at the immigration court in Detroit at a time to be set in the future. Two months later, he received the second document, which notified him that the removal hearing would occur at the immigration court in Detroit on June 25, 2013, at 8:30 a.m. The two documents together included all the statutorily required information. See §1229(a)(1). Niz-Chavez appeared with counsel at the scheduled hearing on June 25, 2013.

At the hearing, Niz-Chavez conceded that he was removable because he was unlawfully in the country. Moreover, Niz-Chavez did not request cancellation of removal or suggest that he was eligible for cancellation of removal, presumably because he received the notice to appear long before he had accrued 10 years of continuous presence in the United States. After further hearings, an Immigration Judge found Niz-Chavez removable as charged and ordered Niz-Chavez to either voluntarily depart from the United States within 30 days or else be removed to Guatemala.

Niz-Chavez now argues that he in fact should be eligible for cancellation of removal. He emphasizes that the continuous-presence clock stops upon service of "*a* notice to appear." §1229b(d)(1). That language, according to Niz-Chavez, means that, to stop the 10-year clock, the Government must provide all the required information *in one document*, rather than two. The Government responds that the statute includes no such requirement and that the Government may serve a notice to appear *in two documents*, with the time and place of the hearing coming in the second document and the 10-year clock stopping then.

The Court today agrees with Niz-Chavez that, in order to stop the 10-year clock, the Government must provide written notice in one document, not two. I find the Court's conclusion rather perplexing as a matter of statutory interpretation and common sense. I therefore respectfully dissent.

I

A

This is not the Court's first case involving a notice to appear for removal proceedings. In *Pereira* v. *Sessions*, the Court held that a notice that does not provide the time and place of the hearing does not stop the 10-year continuous-presence clock. 585 U. S. ___, ___ (2018) (slip op., at 2). Before *Pereira*, the Government (in some Circuits) could send two documents as it did in this case and stop the clock when it served the first, incomplete document. See *id.*, at ___– ___, and n. 4 (slip op., at 7–8, and n. 4). In the wake of *Pereira*, however, service of the first document no longer stops the clock. The clock does not stop until the Government also provides the time and place of the hearing.

In *Pereira*, the Court did not address the distinct question whether the Government may serve a notice to appear in two documents instead of one, with the time and place of the hearing coming in the second document and the clock then stopping upon service of the second document. We must decide that question here.

After *Pereira*, why would the Government still provide notice in two documents instead of one comprehensive document? Simple. When the Government wants to inform the noncitizen that it is initiating removal proceedings, the Government may not yet know exactly when the hearing will occur. So the Government sometimes will first inform the noncitizen of the charges, and only later provide the exact time and place of the hearing.

After *Pereira*, the Government gains no advantage by providing notice in two documents, because the 10-year continuous-presence clock does not stop until the noncitizen has also been served the statutorily required time and place information. See *id.*, at ___ (slip op., at 2). If anyone gains an advantage from two-document notice after *Pereira*, it is noncitizens. They can learn of the removal proceedings and begin preparing a defense even before they receive notice of

the time and place of the hearing. So receiving notice in two documents can benefit noncitizens.

Even though receiving notice in two documents would benefit noncitizens as a group by giving them more time to prepare for hearings, Niz-Chavez understandably seeks to advance his own interests in not having the 10-year clock stopped in his individual case. Niz-Chavez says that to stop the 10-year clock, the Government must provide a single document with all the statutorily required information, because the statute requires "*a* notice to appear."

## B

The Court agrees with Niz-Chavez, resting its conclusion almost entirely on the word "a" in the statutory phrase "a notice to appear." As the Court notes, Congress provided that the 10-year continuous-presence clock stops when the noncitizen is served "a notice to appear" for removal proceedings. 8 U. S. C. §1229b(d)(1).[1] The Court says that the article "a" means that the 10-year continuous-presence clock stops only if the Government serves a single document with all the required information to initiate the removal proceedings, not two documents with all the required information. In my respectful view, the Court's textual interpretation contains two independent flaws, either of which suffices to defeat the Court's conclusion.

*First*, the Court's analysis disregards the statutory definition of a notice to appear.

When a statute defines a term, we ordinarily follow the statutory definition. *Digital Realty Trust, Inc.* v. *Somers*, 583 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 9); *Burgess* v. *United States*, 553 U. S. 124, 129–130 (2008). Here, the statute defines a notice to appear in a somewhat oddly worded way.

———————

[1] As relevant here, the statute provides: "For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end . . . when the alien is served a notice to appear under section 1229(a) of this title." §1229b(d)(1).

The definition is located in the statutory provision that
specifies how the Government must initiate removal pro-
ceedings. That provision states: "*written notice (in this sec-
tion referred to as a 'notice to appear')* shall be given in per-
son to the alien (or, if personal service is not practicable,
through service by mail to the alien or to the alien's counsel
of record, if any) specifying" 10 categories of information
relevant to the removal proceedings. §1229(a)(1) (emphasis
added); see also *Pereira*, 585 U. S., at ___–___ (slip op., at
13–14) (§1229(a)(1) provides the definition of a notice to ap-
pear for purposes of the 10-year clock).[2]

In other words, the statute provides that the 10-year con-

————————
[2] Section 1229(a)(1) provides: "In removal proceedings under section
1229a of this title, written notice (in this section referred to as a 'notice
to appear') shall be given in person to the alien (or, if personal service is
not practicable, through service by mail to the alien or to the alien's coun-
sel of record, if any) specifying the following:

"(A) The nature of the proceedings against the alien.

"(B) The legal authority under which the proceedings are conducted.

"(C) The acts or conduct alleged to be in violation of law.

"(D) The charges against the alien and the statutory provisions alleged
to have been violated.

"(E) The alien may be represented by counsel and the alien will be pro-
vided (i) a period of time to secure counsel under subsection (b)(1) and
(ii) a current list of counsel prepared under subsection (b)(2).

"(F)(i) The requirement that the alien must immediately provide (or
have provided) the Attorney General with a written record of an address
and telephone number (if any) at which the alien may be contacted re-
specting proceedings under section 1229a of this title.

"(ii) The requirement that the alien must provide the Attorney General
immediately with a written record of any change of the alien's address or
telephone number.

"(iii) The consequences under section 1229a(b)(5) of this title of failure
to provide address and telephone information pursuant to this subpara-
graph.

"(G)(i) The time and place at which the proceedings will be held.

"(ii) The consequences under section 1229a(b)(5) of this title of the fail-
ure, except under exceptional circumstances, to appear at such proceed-
ings."

tinuous-presence clock stops upon service of "a notice to appear," and then goes on to define a notice to appear as "written notice." The statute nowhere says that written notice must be provided in a single document. Rather, the statute lists three essential requirements for the Government to notify a noncitizen of removal proceedings: (i) the notice must be "written notice"; (ii) it must be "given in person," if practicable, or else by mail; and (iii) the notice must include the required information, such as the grounds for removal and the time and place of the hearing. §1229(a)(1). Nothing more. But the Court today nonetheless imposes a fourth, atextual single-document requirement for the notice to stop the 10-year clock.

If Congress actually wanted to require a single document to stop the 10-year clock, Congress easily could have (and surely would have) said so. After all, the statute supplies comprehensive and detailed instructions about how the Government must serve a notice to appear and what information must be included. But the statute never says that all the required information must appear in a single document.

Notice delivered in two installments can readily satisfy all the requirements of a notice to appear. Consider the notice served on Niz-Chavez in this case. It was written notice. It was properly served. It contained all the statutorily required information, including the time and place of the hearing. The statute contemplates nothing more of a notice to appear.

Instead of applying that clear statutory definition of a notice to appear as written notice, the Court dismisses the definition's relevance on a novel basis not raised by Niz-Chavez, not advanced by any *amicus* brief, and not adopted by any lower courts—the placement of a quotation mark. The Court reasons that the quotation marks in the statutory definition appear around only the words "notice to ap-

pear," rather than around "*a* notice to appear." On that ba-
sis, the Court insists that the phrase "written notice" de-
fines only the three words "notice to appear"—without the
"a." And substituting "written notice" for "notice to appear"
in the statutory provision addressing the 10-year clock
would still require "a" written notice, which the Court in-
terprets to mean a single document.

According to the Court, Congress thus imposed a single-
document requirement for stopping the 10-year clock not by
actually saying that a single document is required, but ra-
ther by placing quotation marks around the words *a "notice
to appear"* rather than *"a notice to appear"* in the statutory
definition. There is a good reason that Niz-Chavez did not
raise this argument, that no *amicus* brief advanced this ar-
gument, and that no court has adopted it. The Court's the-
ory is mistaken and implausible. If Congress wanted to re-
quire a single document in order to stop the 10-year clock,
it is hard to imagine a more obscure way of doing so. Alt-
hough "the meaning of a statute will typically heed the com-
mands of its punctuation," "a purported plain-meaning
analysis based only on punctuation is necessarily incom-
plete and runs the risk of distorting a statute's true mean-
ing." *United States Nat. Bank of Ore.* v. *Independent Ins.
Agents of America, Inc.*, 508 U. S. 439, 454 (1993). The
Court has declined to rely on "the deployment of quotation
marks" when "all of the other evidence from the statute
points the other way." *Id.,* at 455.

So it is here. The Court's quotation-mark theory contra-
venes the statutory text and structure. The text and struc-
ture make clear that the notice that initiates removal pro-
ceedings is the same notice that stops the 10-year clock. See
§§1229(a)(1), 1229b(d)(1). But the Court's interpretation
treats them as different by imposing different requirements
for a notice that stops the 10-year clock and for a notice that
initiates removal proceedings. To reiterate, to initiate re-
moval proceedings, the Government must provide the

noncitizen with "written notice." The Court does not dispute (and cannot dispute) that the Government can initiate removal proceedings by providing written notice in more than one document, so long as the notice encompasses all the statutorily required information. Nonetheless, for that written notice to also stop the 10-year clock, the Court says that the written notice must be provided in a single document rather than two documents because the 10-year clock provision requires "*a* notice to appear." Stated otherwise, under the Court's novel theory, the Government may use two documents to initiate removal proceedings, but the Government must use a single document if it also wants to stop the continuous-presence clock—even though Congress explicitly linked the notice that stops the clock to the notice that initiates removal proceedings. Put simply, the Court's argument based on the placement of a quotation mark contravenes the straightforward statutory structure and makes little sense.

The Court's novel interpretation also creates another inconsistency. Section 1229a(b)(5) explains that a noncitizen who fails to attend a removal hearing may be removed in absentia if he had previously been provided with "written notice" under §1229(a)(1). Under the Court's interpretation, it is hard to see why such notice would need to be provided in a single document—there are no dangling uses of "a" to latch onto in that provision. It makes no sense that two-document notice could justify removal in absentia but could not stop the continuous-presence clock.

In sum, the Court's theory for disregarding the statutory definition is both novel and unpersuasive. The Court's quotation-mark argument fails because it distorts the "statute's true meaning." *United States Nat. Bank of Ore.*, 508 U. S., at 454. When the statutory definition of a notice to appear as "written notice" is correctly applied, instead of sidestepped, it readily resolves what should have been a very simple statutory case.

*Second*, even if there were no definition in this statute and we therefore had to focus solely on the term "a notice to appear" in isolation, the Court's interpretation of that phrase would still fail.

Ordinary meaning and literal meaning are two different things. And judges interpreting statutes should follow ordinary meaning, not literal meaning. See, *e.g., McBoyle* v. *United States*, 283 U. S. 25, 26 (1931) (in ordinary speech, "vehicle" does not cover an aircraft, even though "etymologically it is possible to use the word" that way); see also A. Scalia, A Matter of Interpretation 24 (1997) (a "good textualist is not a literalist"). The Court here, however, relies heavily on literal meaning: The Court interprets the word "a" in the phrase "a notice to appear" to literally require the Government to serve one (and only one) document. In the Court's words, "a notice" requires "'a' single document containing the required information." *Ante,* at 5.

As a matter of ordinary parlance, however, the word "a" is not a one-size-fits-all word. As relevant here, the word "a" is sometimes used to modify a single thing that must be delivered in one package, but it is sometimes used to modify a single thing that can be delivered in multiple installments, rather than in one installment. Context is critical to determine the proper meaning of "a" in a particular phrase. Consider some examples. A car dealership that promises to ship "a car" to a customer has not fulfilled its obligation if it sends the customer one car part at a time. By contrast, it is common to submit "a job application" by sending a resume first and then references as they are available. When the final reference arrives, the applicant has submitted "a job application." Similarly, an author might submit chapters of a novel to an editor one at a time, as they are ready. Upon submission of the final chapter, the author undoubtedly has submitted "a manuscript." "A contract" likewise can be "established by multiple documents." *Secretary of U. S. Air Force* v. *Commemorative Air*

*Force*, 585 F. 3d 895, 901 (CA6 2009). The list goes on.

As those examples demonstrate, and as the Court acknowledges, the article "a" can be perfectly consistent with delivery in installments. And in this case, the better reading of the article "a" is that it does not require delivery in only one installment. A notice to appear for a removal hearing is more like a job application, a manuscript, and a contract than it is like a car. A notice to appear conveys information, like a job application, a manuscript, and a contract. And unlike a car, a notice to appear is easy for the recipient to assemble from its constituent installments.

The Court prefers a different analogy. To buttress its interpretation, the Court analogizes the notice to appear to legal documents that initiate criminal cases, like indictments. The Court reasons that "an indictment" traditionally provides all the required information in a single document, so "a notice to appear" must do so as well. *Ante,* at 7–8.

But that analogy is misplaced. An indictment generally provides charging information. By contrast, a notice to appear provides charging information *and* logistical calendaring information that is not always knowable at the time of charging. As the Court said in *Pereira*, a notice to appear is more than just a charging document because it serves "another equally integral function: telling a noncitizen when and where to appear." See 585 U. S., at \_\_\_, n. 7 (slip op., at 13, n. 7). In other words, a notice to appear is akin to a charging document *plus* a calendaring document. It is therefore easy to understand why a notice to appear might require two installments while an indictment requires only one. The analogy to an indictment actually cuts strongly *against* the Court's interpretation.

In addition, interpreting "a notice to appear" to allow delivery in two documents makes much more sense in context here because it allows the Government to alert the noncitizen of the charges well before a time and place have been

set for the hearing. That affords the noncitizen more time
to prepare a defense. And a noncitizen suffers no prejudice
from receiving notice in two documents rather than one, as
Niz-Chavez's case amply demonstrates. In short, a noncit-
izen gains something and loses nothing meaningful from re-
ceiving all the information in two documents. (The same
cannot be said for receiving a car in two installments, for
example.)

The Court's interpretation, by contrast, spawns a litany
of absurdities. For example, under the Court's interpreta-
tion, the 10-year clock does not stop if the noncitizen re-
ceives the two separate documents *on the same day but in
different envelopes.* But the clock does stop if the noncitizen
receives the two documents in one envelope. What sense
does that make? Moreover, if a noncitizen receives a first
document without a time and place and a second document
with only the time and place, that does not stop the clock
under the Court's rule. But if a noncitizen receives a first
document with all the information including the time and
place and then a second document with all the information
and a *new* time and place, that first document does stop the
clock under the Court's rule. What sense does that make?

Indeed, the Court deems Niz-Chavez to have never re-
ceived proper notice of the hearing even though he received
all the statutorily required information and *actually ap-
peared with counsel at the hearing.* Again, what sense does
that make?

The Court blames those absurdities on Congress and says
that Congress would have chosen to omit the article "a" if it
wanted to allow two documents. The Court's apparent the-
ory is that Congress deliberately employed the word "a" to
obliquely impose an additional procedural obligation on the
Government when the Government initiates removal pro-
ceedings against a noncitizen and wants to stop the 10-year
clock. That theory is no more plausible than the Court's

first theory that Congress used the placement of a quotation mark to impose a new procedural obligation. Once again, if Congress wanted to require the Government to send a notice to appear in one document rather than two documents in order to stop the 10-year clock, Congress easily could have said so, and undoubtedly would have said so. But it did not. The bottom line is that this new single-document requirement comes from this Court, not Congress. The Court's attempt to deflect blame is unpersuasive.

In sum, the Court's interpretation of the statutory text is wrong for two independent reasons, either of which suffices to defeat the Court's conclusion. First, the statutory definition of a notice to appear as "written notice" establishes that "a notice to appear" can be delivered in two installments. Second, even if there were no statutory definition, the best reading of "a notice to appear" in this context is that the notice can be provided in two installments.

C

The Court seeks to support its textual analysis with additional arguments based on structure, statutory history, and post-enactment regulatory history. Those arguments do not help.

*First*, start with structure. The Court says that three other statutory provisions—§§1229(e)(1), 1229a(b)(7), and 1229(a)(2)—imply that a notice to appear is a single document. *Ante*, at 9–11. But none of the three provisions actually requires the Government to serve a notice to appear in a single document. Moreover, the language in all three provisions is consistent with a two-document notice to appear.

The first provision, §1229(e)(1), addresses the Government's notice obligations when it seizes a noncitizen at a domestic violence shelter or other location as a precursor to removal proceedings. In those cases, §1229(e)(1) says that "the Notice to Appear shall include" a statement that the

Government has complied with certain protections for noncitizens. The Court says that the phrase "the Notice" implies a single document because it pairs an article with a singular noun. *Ante*, at 9–10. But the reference in §1229(e)(1) to "the Notice to Appear" does not require or even contemplate a single document. Like the article "a," the article "the" can be used with a thing delivered in constituent installments—consider "the job application," "the manuscript," or "the contract." Section 1229(e)(1) simply requires the Government to include the necessary statement of compliance in one of the documents constituting the notice to appear.

The second provision, §1229a(b)(7), concerns noncitizens who fail to appear at removal proceedings and are ordered removed in absentia. Section 1229a(b)(7) says that a noncitizen in that situation is ineligible for certain kinds of relief from removal for 10 years if the noncitizen was provided oral notice "at the time of" the written notice to appear. §1229a(b)(7). The Court argues that the provision's reference to "the time of" the written notice implies that the written notice is necessarily delivered at one particular moment, and therefore in one single document. *Ante*, at 10–11. On the contrary, the reference in §1229a(b)(7) to "the time of" the written notice is entirely consistent with two-document notice. Notice qualifies as "a notice to appear" only when it includes the time and place of the removal hearing. *Pereira*, 585 U. S., at \_\_\_, \_\_\_ (slip op., at 2, 9). So when the Government uses two documents to serve a notice to appear, "the time of" the written notice is the time when the noncitizen is served the second installment that provides the time and place of the hearing.

The third provision, §1229(a)(2), supplies a procedure for changing the time or place of a removal hearing. It requires the Government to give a noncitizen "a written notice" of the new time and place. The Court concludes that the reference to "*a* written notice" requires a single document, and

so "*a* notice to appear" must as well. *Ante,* at 11. As a practical matter, the Government may need only one document to change the time or place of the hearing. But the word "a" in the phrase "a written notice" does not *require* the Government to use a single document, just as the word "a" in the phrase "a notice to appear" does not. Section 1229(a)(2), like the other two provisions, is entirely consistent with the Government's reading of the statute.

*Second*, the Court also invokes statutory history to support its interpretation. But the statutory history does not advance the Court's argument. Before 1996, the immigration statute required the Government to serve an "order to show cause" rather than a notice to appear. 8 U. S. C. §1252b(a)(1) (1994 ed.). Back then, the statute allowed the Government to notify a noncitizen of the time and place of the removal hearing either "in the order to show cause or otherwise." §1252b(a)(2)(A) (1994 ed.). The pre-1996 statute similarly defined an order to show cause as "written notice"—a broad term that does not require one document. §1252b(a)(1) (1994 ed.). In 1996, Congress made some significant changes. Congress replaced suspension of deportation with cancellation of removal. Illegal Immigration Reform and Immigrant Responsibility Act, §§304(a), 308(b)(7), 110 Stat. 3009–587, 3009–615 (codified at 8 U. S. C. §1229b). Congress extended the continuous-presence requirement to 10 years for nonpermanent residents. 110 Stat. 3009–594 (codified at §1229b(b)(1)(A)). Congress also changed the order to show cause to a notice to appear, and required the Government to provide the time and place information in that notice to appear. 110 Stat. 3009–588 (codified at §1229(a)(1)(G)(i)). And Congress also provided for the first time that service of the notice to appear would stop the continuous-presence clock. 110 Stat. 3009–595 (codified at §1229b(d)(1)).

But amid all those changes, Congress never required that a notice to appear include all the required information in a

single document.  The Court nonetheless speculates that a
"rational Congress easily could have thought" it sensible to
peg the end of the continuous-presence clock to a single doc-
ument.  *Ante*, at 11.  Maybe so.  But a rational Congress
also could have declined to impose a single-document re-
quirement.  What matters is that the *actual* Congress de-
clined to impose a single-document requirement in 1996,
just as it had declined to do before 1996.

*Third*, the Court turns to post-enactment regulatory his-
tory.  According to the Court, language in the preamble to
a 1997 notice of proposed rulemaking issued jointly by the
Immigration and Naturalization Service and the Executive
Office for Immigration Review suggests that those agencies
once believed that a single document was required.  *Ante,*
at 12; see 62 Fed. Reg. 449.  Even assuming that this exec-
utive agency interpretation (found in a preamble to a notice
of proposed rulemaking) could alter the otherwise-best in-
terpretation of the statute, the proposed rule that follows
the preamble undercuts the Court's characterization of the
agencies' 1997 position.  The 1997 proposed rule stated that
the Government would include the time and place of the re-
moval hearing in the initial charging document "*where
practicable.*"  *Id.,* at 457 (emphasis added).  And the pro-
posed rule gave alternative instructions for when time and
place information "is not contained" in the initial document.
*Ibid.*  That formulation does not reflect a single-document
interpretation of the statute.  So post-enactment regulatory
history does not help the Court any more than statutory
history; indeed, the post-enactment regulatory history ap-
pears in significant tension with the Court's reading.

In the end, the Court's arguments based on structure and
history all fail to answer a very simple question: If Congress
wanted all the information to be included in one document
in order to stop the 10-year clock, why did Congress not say
that all the information must be included in one document?

## II

The Court concludes its opinion by suggesting that its decision will rein in the Federal Government and produce policy benefits for noncitizens. But the Court's decision will not meaningfully benefit noncitizens going forward, and it will ultimately benefit few if any noncitizens who have already been notified of their removal proceedings. Meanwhile, the Court's decision will impose significant costs on the immigration system, which of course means more backlog for *other noncitizens* involved in other immigration cases.

To be clear, demonstrating that the Court is wrong to predict policy benefits from its decision is not ignoring a "statutory command" in favor of policy views. *Ante,* at 15. Rather, the point here is that the Court's opinion both errs as a matter of statutory interpretation *and* will not meaningfully help noncitizens, contrary to the Court's prediction.

Start with the supposed policy benefit that the Court identifies: The Court suggests that its decision will help noncitizens by stopping the Government from sending numerous documents (more than two) to noncitizens over a period of months or even years, perhaps in an effort to confuse them. But the Court does not point to any examples of the Government *actually* serving a notice to appear in more than two documents, or over a period of years. After all, why would the Government do so, absent a need to reschedule a hearing? It would make no sense. Under the statute as interpreted in *Pereira*, the Government cannot stop the continuous-presence clock until it provides the time and place of the removal hearing. And the immigration court cannot commence the removal hearing until the Government does so. So wasting years and sending multiple documents to serve a notice to appear would only work to the Government's disadvantage because it would delay the hearing. The supposed "benefit" of the Court's decision,

then, is simply to prevent the Government from doing something that it has no incentive to do in the first place. The Court's opinion cures a problem of its own imagination.

In fact, the Court's decision will not alter the delivery of notice in any meaningful way. Going forward, when the Government wants to initiate the process of removing a noncitizen before it knows with certainty the time and place of the noncitizen's initial removal hearing, the Government can comply with today's decision in one of three ways. None of the three alternatives provides meaningful benefits for noncitizens as compared to the Government's current practice of sometimes using two documents, and two of the options are worse for noncitizens.

The first way that the Government can comply with today's decision is simply to do what it did in Niz-Chavez's case, with one minor change. The Government can still send an initial document that informs the noncitizen of all relevant information except the time and place of the hearing, and then a second document that supplies the time and place of the hearing. All that the Government needs to do to comply with today's decision and still stop the 10-year clock is to repeat all the information from the first document in the second document, or alternatively to provide a copy of the first document when it serves the second. Delivered together, the two attachments will form a single, complete notice to appear even under the Court's strained interpretation, and therefore will stop the 10-year clock. (Counsel for Niz-Chavez forthrightly conceded all of this at oral argument. Tr. of Oral Arg. 24.) The Court insists that this change in practice will still help noncitizens, but it fails to explain how. The first document sent to Niz-Chavez in this case informed him that he was required to carry the document with him at all times. Especially in light of that obligation, it is hard to see any meaningful benefit in the Government's resending the same initial document to a noncitizen once the hearing has been scheduled.

But even if that first possible method of complying with today's decision would benefit noncitizens in some minimal way, it is not clear that the Government will actually choose that option. Instead, the Government can comply with today's decision in other ways that will leave noncitizens *worse off*. As a second option, for example, the Government may stop sending the first document at all and just wait until it can provide all the information in one comprehensive document—necessarily closer to the date of the hearing. That would indisputably comply with today's decision but would disadvantage noncitizens by affording them less time to prepare for removal hearings.

The third possible option is no better for noncitizens. When the Government is ready to initiate removal proceedings but does not know the time and place of a hearing, it could comply with the Court's decision by sending a document with a placeholder time and place of the hearing and then later serve a second document with the actual time and place of the hearing. As counsel for Niz-Chavez conceded at oral argument, doing so would comply with the statute and allow the Government to stop the continuous-presence clock upon service of the *initial* document rather than the second document. *Id.,* at 15. That option would give noncitizens *less* time to accrue continuous presence than when the Government includes the time and place only in the second document. Moreover, that approach—sending the noncitizen two different times or places—is a recipe for confusion.

In short, the Court's conclusion today will not necessarily help noncitizens or constrain the Government going forward.[3]

_____

[3] The Court says that the immigration policy advocates who filed *amicus* briefs in support of Niz-Chavez disagree with that assessment of the consequences of today's decision. But those briefs are especially concerned with the Government stopping the clock with a notice that has a

But *looking backwards*, will the Court's decision at least supply a benefit to some noncitizens such as Niz-Chavez who *previously* received a notice to appear in two documents? To begin with, any noncitizen who becomes eligible for cancellation of removal notwithstanding the noncitizen's receipt of all the required information in writing before 10 years of continuous presence would receive a windfall based on the thinnest of technicalities. Consider Niz-Chavez himself. He received all the required information before the 10-year clock had run, he showed up at the hearing with counsel, and he suffered zero prejudice from receiving notice in two documents rather than one.

But in any event, that eligibility windfall is unlikely to translate to any real-world benefit for many noncitizens in Niz-Chavez's position. To be sure, today's decision means that some noncitizens in Niz-Chavez's position will now become *eligible* for cancellation of removal. But that does not mean that those noncitizens will actually *receive* cancellation of removal as a result of today's decision. Cancellation of removal is discretionary. §§1229b(a), (b)(1). In other words, today's decision means only that immigration judges have discretion to grant cancellation of removal for some noncitizens who received notice in two documents.

And there is another apparent catch. Subject to a few exceptions not relevant here, the number of noncitizens who may receive cancellation of removal is capped by statute at only 4,000 per year. §1229b(e)(1). Those 4,000 spots are "coveted and scarce"—so scarce, in fact, that in recent years, "according to the Executive Office for Immigration

_____

placeholder date and then sending a later document with the actual date. See, *e.g.,* Brief for American Immigration Lawyers Association et al. as *Amici Curiae* 15–19; Brief for Thirty-Three Former Immigration Judges and Members of the Board of Immigration Appeals as *Amici Curiae* 18–23. Yet as counsel for Niz-Chavez forthrightly conceded at oral argument, the approach adopted by the Court today will still allow that practice going forward. See Tr. of Oral Arg. 15.

Review, 3,500 cancellation of removal slots have been filled on the first day" of the year. *Matter of Castillo-Perez*, 27 I. & N. Dec. 664, 669 (Atty. Gen. 2019). "The other 500 slots are set aside to be granted to detained aliens throughout the year." *Ibid.* Perhaps a small handful of the noncitizens who receive an eligibility windfall as a result of today's decision will ultimately also receive cancellation of removal. But that is far from clear.

Meanwhile, the Court's decision will impose substantial costs and burdens on the immigration system, as the Government has detailed. Tr. of Oral Arg. 52–54. Because today's decision means that many more people who have been in removal proceedings may be eligible for cancellation of removal, presumably many more people will apply. And processing all of those extra applications for cancellation of removal will impose costs on the immigration system and create backlogs and delays for other noncitizens trying to get their day in court. More than 1.2 million cases are currently inching their way through the immigration courts. Dept. of Justice, Executive Office for Immigration Review Adjudication Statistics, Pending Cases, New Cases, and Total Completions (Jan. 7, 2021). If even a small portion of the noncitizens with pending removal cases become eligible for cancellation of removal solely because of today's decision, and then apply for cancellation of removal, the immigration courts will need to expend substantial resources to timely consider those applications for relief, even though many of them are likely to be denied.

In sum, the Court's statutory conclusion in this case will not necessarily help noncitizens. The Court's statutory interpretation is not likely to create meaningful benefits for many noncitizens going forward, and it is not likely to create benefits for many noncitizens looking backwards. And it will impose serious administrative burdens on an immigration system that is already overburdened, thereby harming other noncitizens.

\*    \*    \*

As a matter of policy, one may reasonably debate the circumstances under which a noncitizen who is unlawfully in the country should be removed and should be eligible for cancellation of removal. But those policy choices are for the political branches. Our job is to follow the law passed by Congress and signed by the President.

The statute here requires the Government to serve the noncitizen with written notice of the charges and other required information, including the time and place of the hearing. In this case, Niz-Chavez received written notice of the charges and all the required information, including the time and place of his hearing. Niz-Chavez appeared with counsel at his hearing in Detroit on June 25, 2013. Because he received written notice to appear before he had accumulated 10 years of continuous physical presence, he is not eligible for cancellation of removal. I respectfully dissent.