RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0155p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

IN RE: CARRIE ANN REINHARDT; TIMOTHY CONRAD
REINHARDT,

               *Debtors*.

_____

CARRIE ANN REINHARDT,

               *Plaintiff-Appellant*,

  *v*.

WESTON PRINCE, Bay County Treasurer,

               *Defendant-Appellee*.

No. 25-1072

_____

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:23-cv-13233—George Caram Steeh III, District Judge.
_____

United States Bankruptcy Court for the Eastern District of Michigan at Bay City.
Nos. 1:22-bk-20558; 1:22-ap-2017—Daniel S. Opperman, Bankruptcy Judge.

Argued: July 31, 2025

Decided and Filed: May 27, 2026

Before: MOORE, GRIFFIN, and NALBANDIAN, Circuit Judges.
_____

## COUNSEL

**ARGUED:** Matthew A. Sous, LEGAL SERVICES OF EASTERN MICHIGAN, Saginaw, Michigan, for Appellant. Andrew C. Thompson, POZNAK DYER KANAR SCHEFSKY THOMPSON, PLC, Midland, Michigan, for Appellee. **ON BRIEF:** Matthew A. Sous, LEGAL SERVICES OF EASTERN MICHIGAN, Saginaw, Michigan, for Appellant. Andrew C. Thompson, POZNAK DYER KANAR SCHEFSKY THOMPSON, PLC, Midland, Michigan, for Appellee.

---

**OPINION**

---

NALBANDIAN, Circuit Judge.  In Michigan, counties follow a years-long process when foreclosing on properties to satisfy property tax liens.  In the third and final year of this process, a court enters a foreclosure judgment against the property.  Then, the property owner must pay off the tax lien before the judgment's deadline or else the county receives title to the property.  Once the county has title, the former owner loses all rights to the property except the right to the foreclosure sale's proceeds.  But the county takes a cut, which includes the tax deficiency, interest, fees, a 5% sales commission, and the county's expenses.

This case involves the interaction between that process and the United States Bankruptcy Code.  Carrie Ann Reinhardt owned a house in Bay County, Michigan.  In 2019, she didn't pay her property taxes, so Bay County initiated foreclosure.  When a Michigan court entered a foreclosure judgment against the property three years later, Reinhardt owed the county $5,845 and the property's fair market value was roughly $75,000.  Bay County received title to Reinhardt's property.  And shortly after, Reinhardt filed for Chapter 13 bankruptcy and then filed a complaint seeking to avoid (undo) the transfer of title as preferential under the Code.

The bankruptcy court granted the Bay County Treasurer's summary-judgment motion and denied Reinhardt's.  The district court affirmed.  But because we find that Reinhardt established that the transfer was preferential under 11 U.S.C. § 547(b)(4) and § 547(b)(5) as a matter of law, we reverse.

**I.**

**A.**

Michigan's General Property Tax Act (GPTA) describes the years-long tax foreclosure process for county treasurers to collect unpaid property taxes.[1]  The GPTA subjects all taxpayers

---

[1]We note as background that the GPTA's process for property-tax foreclosures has been the subject of much recent litigation in both state and federal court.  Under an earlier version of the GPTA, Michigan permitted counties to keep proceeds from a foreclosure sale above the deficiency amount—a practice that the Michigan

with delinquent property taxes in a given tax year to the same general timeline and process. *See generally* Mich. Comp. Laws § 211.78 *et seq.* The process can end in two ways. Either the taxpayer pays the delinquent taxes during the process, which terminates the proceedings and leaves the taxpayer with title. Or the taxpayer doesn't pay, in which case the county receives title to the property to sell later in the year. To fit Reinhardt's situation, we'll describe the GPTA's timeline from the perspective of a taxpayer who didn't pay 2019 property taxes.

If a taxpayer doesn't pay her 2019 property taxes, then the county treasurer receives a super-priority tax lien on the property in December 2019. *Id.* § 211.40. The unpaid taxes become "delinquent" in March 2020, and they start accruing fees and interest at a non-compounded rate of 1% per month. *Id.* § 211.78a(2)–(3). And if the tax lien remains unpaid for another year, the taxpayer "forfeits" the property on March 1, 2021, and a $175 fee is added to the lien. *Id.* § 211.78g(1). The county treasurer must record a certificate of forfeiture with the county register of deeds within 45 days. *Id.* § 211.78g(2). This recording allows the treasurer to continue the foreclosure process, but the county doesn't "acquire a right to possession or any other interest in the property." *Id.* § 211.78(8)(b); *see also id.* § 211.78g(1)–(2). The forfeiture also triggers an additional non-compounded interest of 0.5% per month, calculated from the previous March 1 when the taxes had become delinquent. *Id.* § 211.78g(3)(b).

Then the county must petition for foreclosure with the state circuit court before June 15, 2021. *Id.* § 211.78h(1). If the tax lien remains unpaid and the county satisfies the GPTA's notice requirements, a Michigan circuit court holds a judicial foreclosure hearing between January 30 and February 28, 2022, and enters a foreclosure judgment by March 30, 2022. *Id.* §§ 211.78h(5), 211.78k(5). But the judgment can't go into effect before March 31. *Id.* § 211.78k(5). The March 31 effective date marks when fee simple title to the property "vest[s] absolutely" in the county and the taxpayer loses "[a]ll redemption rights to the property." *Id.* On

---

Supreme Court said violated Michigan's Takings Clause and we said violated the federal Takings Clause. *Hall v. Meisner*, 51 F.4th 185, 196 (6th Cir. 2022); *Rafaeli, LLC v. Oakland County*, 952 N.W.2d 434, 466 (Mich. 2020). And the U.S. Supreme Court agreed with respect to a similar process in Minnesota. *See Tyler v. Hennepin County*, 598 U.S. 631, 635–39 (2023). The Michigan legislature changed its foreclosure law to the system that governs this case. But that's not the end of it. The U.S. Supreme Court is poised to decide a case involving whether the proceeds due to the property owner should be measured using the fair market value of the property as opposed to the actual sale price at auction. *See Pung v. Kopke*, 2025 WL 318222 (6th Cir. Jan. 28, 2025), *cert. granted*, 146 S. Ct. 80 (2025).

that date, the judgment also extinguishes most liens and interests associated with the property. *Id.* § 211.78k(5)(c), (e).  And on April 1, the county gains the right to possess the property.  *Id.* § 211.78g(1).

Once the county receives title, it must record the foreclosure judgment with the county register of deeds.  *Id.* § 211.78k(8).  And then it must attempt to sell the property by arranging public auctions between July and November 2022.  *Id.* § 211.78m(2)–(5).  The county can bundle foreclosed properties for sale in groups.  *Id.* § 211.78m(2).  But the GPTA requires that it offer each property for at least the "minimum bid," which must include the delinquent taxes (including interest), penalties, and fees due on the property and may include any additional expenses incurred by the county related to the property's foreclosure and auction.  *Id.* § 211.78m(16)(c).  The county can offer a property for sale at later auctions if no one purchased it at the first.  But after at least one attempt to sell for the minimum bid, the county can declare the next auction to be the property's final auction and "establish a reasonable opening bid at the sale to recover the cost of the sale of the property or properties" rather than adhering to the earlier minimum bid requirement.  *Id.* § 211.78m(5).

In addition to public auctions, the government has a chance to get in on the action. Before the first auction is held, state and local government entities can purchase the property for the greater of the minimum bid or the fair market value.  *Id.* § 211.78m(1).  And in between the first and second public auctions, those entities have another chance to purchase the property—this time for just the minimum bid.  *Id.* § 211.78m(3).

The taxpayer—and any other party who had an interest in the property before the foreclosure—has a right to claim remaining proceeds from the sale by first filing a notice of intent to claim the proceeds by July 1, 2022.  *Id.* § 211.78t(2).  Then, after the county provides the taxpayer with notice of the sale and her right to claim proceeds, the taxpayer must file a motion with the foreclosing court by May 15, 2023.  *Id.* § 211.78t(3)–(4).  In response to the motion, the foreclosing court holds a hearing at which the taxpayer bears the burden of proving her right to proceeds.  *Id.* § 211.78t(9).  If the taxpayer meets her burden, the court orders the county to distribute the remaining proceeds to the taxpayer.  *Id.*

Assuming the taxpayer was the only claimant, the proceeds owed to her follow a simple equation: the sale price of the property less (1) the minimum bid, (2) any other fees or expenses related to disposing of the property, and (3) a 5% sales commission to the county. *Id.* § 211.78t(12)(b).[2]

**B.**

In Reinhardt's case, the parties agree that the Bay County Treasurer complied with the GPTA's procedures. In November 2015, Reinhardt became the owner of a property in Bay County, Michigan. She took this property subject to a mortgage held by PNC Bank. And she paid her property taxes on time for several years.

But in 2019, she didn't pay her property taxes. So Bay County received its super-priority tax lien in December 2019, and the taxes became delinquent in March 2020. A year later, on March 1, 2021, Reinhardt still hadn't paid the tax debt, so the Treasurer recorded a certificate of forfeiture with the county register within the required 45 days.

In June 2021, the Treasurer filed a petition for foreclosure in a Michigan circuit court. And on February 18, 2022, the circuit court entered a judgment of foreclosure. The judgment said:

> Fee simple title to each parcel foreclosed upon by this Judgment will vest absolutely in [the Treasurer] . . . without any further rights of redemption, if all forfeited delinquent taxes, interest, penalties and fees foreclosed against the parcel, plus any additional interest required by statute, are not paid to the County Treasurer on or before March 31, 2022.

R.3, Bankr. R., PageID 172. Reinhardt didn't pay, so the foreclosure judgment took effect on March 31. And the Treasurer recorded the judgment with the county register on April 5.

---

[2]There's some evidence, however, that potential claimants to remaining proceeds aren't recovering what they could under the GPTA. In 2021, Bay County sold around 30 foreclosed properties above the minimum bid. These sales netted Bay County around $170,000 in excess proceeds—meaning proceeds exceeding the properties' aggregated minimum bids. Six claimants filed timely notices of intent to claim remaining proceeds. But none of them followed up with a motion to the foreclosing court to recover those proceeds. And for 2022, we know that the sales netted Bay County over $300,000 in excess proceeds, but we don't have information in the record revealing whether any claimants to remaining proceeds were successful.

On June 8, Reinhardt preserved her right to remaining proceeds by filing a timely notice. Because PNC Bank (whose mortgage lien had been extinguished by the judgment) filed its notice late, Reinhardt is the only one who filed a timely notice.

And on June 10, she filed for Chapter 13 bankruptcy. Because the property was her only potential asset with unexempt value, Reinhardt premised her proposed Chapter 13 plan on avoiding the transfer of title to the Treasurer. If the transfer were avoided, her plan called for paying the Treasurer's lien in full and then paying the roughly $18,000 owed to other creditors— $8,826 to PNC Bank for its mortgage lien and $8,965 to unsecured creditors.

But the bankruptcy trustee was unwilling to try to set aside the transfer. So shortly after filing for bankruptcy, Reinhardt filed a complaint against the Treasurer to avoid the transfer of title as "preferential" under the Bankruptcy Code. The Treasurer had planned to offer Reinhardt's property for sale for the first time in August 2022 along with other Bay County properties, but he withdrew the property from the auction in June because of Reinhardt's bankruptcy filing. At that August sale, though the Treasurer offered other properties for sale individually, he didn't offer any properties for sale as a bundle.

Reinhardt and the Treasurer filed cross-motions for summary judgment. They agreed on several facts. They stipulated that Reinhardt owed Bay County $5,845 in delinquent taxes, accrued interest, and fees on the June 10 bankruptcy petition date. And they stipulated that the minimum bid for the property would've been $11,055 if the property had been offered at the August 2022 tax sale. They also submitted a realtor's estimate of the property's fair market value for the spring and summer of 2022—the estimate was $73,500 to $79,900. For the August tax sale, Reinhardt estimated that the property would've sold for around $37,000. But the Treasurer didn't provide his own estimate, nor did he dispute the accuracy of Reinhardt's estimate. Instead, he used $73,500, the low end of the property's fair market value, to illustrate his argument without conceding that the property would've sold for that amount.

The parties' disagreement on summary judgment centered on two requirements to avoid a transfer as "preferential" under the Code: (1) the transfer must occur within a 90-day period before the bankruptcy petition's filing (the lookback period); and (2) the transfer must enable the

creditor to receive more than he would've if the transfer hadn't happened and the debtor's estate had been liquidated in a Chapter 7 bankruptcy (the "more than" test).  11 U.S.C. § 547(b)(4)–(5).

The bankruptcy court granted the Treasurer's motion for summary judgment and denied Reinhardt's.  It found that, though the transfer had occurred within the lookback period, Reinhardt couldn't satisfy the "more than" test.  The district court affirmed.  Though the district court didn't address the lookback period, it agreed that Reinhardt couldn't satisfy the "more than" test.  Reinhardt appealed.

## II.

### A.

Federal Rule of Civil Procedure 56 provides the basis for summary judgment.  And the Federal Rules of Bankruptcy Procedure make Rule 56 applicable to adversary bankruptcy proceedings.  Fed. R. Bankr. P. 7056.  So bankruptcy courts grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material only if it might affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a genuine dispute of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  Though we draw all reasonable inferences for the nonmoving party, that party must identify significant probative evidence to counter the movant's showing.  *Bivens v. Zep, Inc.*, 147 F.4th 635, 642 (6th Cir. 2025).  If the movant's evidence isn't disputed by the nonmoving party, then the uncontradicted evidence governs.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).

Though the district court issued an intervening and reasoned decision, we look to the bankruptcy court's opinion, reviewing its legal conclusions de novo and its factual findings for clear error.  *In re M.J. Waterman & Assocs., Inc.*, 227 F.3d 604, 607 (6th Cir. 2000).  And "[a]lthough the denial of a motion for summary judgment is usually an interlocutory order that is not immediately appealable, where 'an appeal from a denial of summary judgment is presented in tandem with a grant of summary judgment, this court has jurisdiction to review the propriety of the [bankruptcy] court's denial of summary judgment.'" *Walls v. Amerisure Mut. Ins. Co.*,

343 F.3d 881, 884 (6th Cir. 2003) (quoting *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 235 (6th Cir. 2003)).

**B.**

This case is about the meaning of 11 U.S.C. § 547(b), which allows a debtor in bankruptcy to avoid "preferential" transfers.  For a transfer to be preferential, the debtor bears the burden of showing that the transfer satisfies the requirements described in § 547(b).  *See* 11 U.S.C. §§ 522(h), 547(g).

The parties dispute two requirements—§ 547(b)(4)'s lookback requirement and § 547(b)(5)'s "more than" test.  Section 547(b)(4) requires the debtor to show that the transfer was made "on or within 90 days before the date of the filing of the [bankruptcy] petition."  *Id.* § 547(b)(4).  Section 547(b)(5) requires the debtor to show that the transfer "enables [the] creditor to receive more than [the] creditor would receive if—(A) the case were a case under [C]hapter 7 of this title; (B) the transfer had not been made; and (C) [the] creditor received payment of such debt to the extent provided by" the Code.  *Id.* § 547(b)(5).

Reinhardt argues that we can consider only § 547(b)(5)'s "more than" requirement because, though the bankruptcy court addressed the § 547(b)(4) issue, the district court didn't and the Treasurer didn't file a cross-appeal.

We disagree.  It's "only necessary and appropriate to file a cross-appeal when a party seeks to enlarge its own rights under the judgment." *Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 571 n.2 (6th Cir. 2008) (quoting *Bailey v. Dart Container Corp.*, 292 F.3d 1360, 1362 (Fed. Cir. 2002)); *see also Greenlaw v. United States*, 554 U.S. 237, 244–45 (2008).  In fact, "a cross-appeal is inappropriate when the only relief sought is an affirmance of the [bankruptcy] court judgment." *Shropshire*, 550 F.3d at 571 n.2.  Without filing a cross-appeal, the Treasurer can still argue in favor of the bankruptcy court's order based on "any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it." *Baatz v. Columbia Gas Transmission, LLC*, 929 F.3d 767, 774–75 (6th Cir. 2019) (quoting *United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924)); *see also Greenlaw*, 554 U.S. at 250 n.5.  Here, the Treasurer doesn't seek to

expand his rights by raising the § 547(b)(4) lookback question.  Instead, he argues that we should affirm the bankruptcy court's order on grounds rejected by that court.

So the Treasurer didn't need to file a cross-appeal.  And because we can affirm on any basis supported by the record when we review a bankruptcy court's decision, we can consider both the § 547(b)(4) and § 547(b)(5) issues.  *See Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 886 (6th Cir. 2020).  We address each issue, starting with § 547(b)(4) and whether the transfer occurred no more than 90 days before the bankruptcy petition date, June 10, 2022.

## III.

The Code authorizes the avoidance of transfers made no more than 90 days before the debtor filed her bankruptcy petition.  11 U.S.C. § 547(b)(4)(A).  So with June 10, 2022, as her petition date, Reinhardt can satisfy this requirement if the transfer occurred on or after March 12.  *See* Fed R. Bankr. P. 9006(a)(1).  Reinhardt says a transfer occurred on March 31, the effective date of the foreclosure judgment.  But the Treasurer says the transfer occurred outside the 90-day window, on February 18, when the circuit court entered the foreclosure judgment.  The bankruptcy court found for Reinhardt on this issue, reasoning that the transfer occurred when title vested in the Treasurer on March 31.

Whether a transfer was made on March 31 rests on two questions.  We first ask whether the purported March 31 transfer falls within the Code's definition of "transfer."  *See* 11 U.S.C. § 101(54).  If it does, we then ask when that transfer was perfected because the Code links a transfer's date to its perfection date.  *See id.* § 547(e)(2).

### A.

#### 1.

To determine when a transfer occurred, we look to both state and federal law.  Federal law matters because the Code defines "transfer."  *Barnhill v. Johnson*, 503 U.S. 393, 397–98 (1992).  And the Code's definition has well-established breadth.[3]  It defines "transfer" as:

---

[3]*See, e.g.*, *Barnhill*, 503 U.S. at 400 ("We acknowledge that § 101(54) adopts an expansive definition of transfer."); *Meoli v. Huntington Nat'l Bank*, 848 F.3d 716, 728 n.6 (6th Cir. 2017); *In re Boy Scouts of Am.*, 137

"(A) the creation of a lien; (B) the retention of title as a security interest; (C) the foreclosure of a debtor's equity of redemption; or (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) an interest in property." 11 U.S.C. § 101(54). And state law matters because "[p]roperty interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 55 (1979); *see also In re Morehead*, 249 F.3d 445, 447–48 (6th Cir. 2001).

Here, if a transfer occurred on March 31, then it happened as defined by § 101(54)(C) or § 101(54)(D) or both. We find that it happened at least under § 101(54)(D). So we don't need to address § 101(54)(C) to affirm the bankruptcy court on this issue.

Section 101(54)(D) classifies any parting with property or "an interest in property" as a transfer. The Code doesn't define "interest," but the Supreme Court has noted that "interest" is "[t]he most general term that can be employed to denote a right, claim, title or legal share in something." *Russello v. United States*, 464 U.S. 16, 22 (1983) (quoting *Interest*, *Black's Law Dictionary* (5th ed. 1979)); *see also In re Emmet Cnty. Treasurer for Foreclosure*, 9 N.W.3d 142, 145 (Mich. Ct. App. 2023) (quoting *Interest*, *Black's Law Dictionary* (11th ed. 2019)). And the Code's definition includes involuntary modes of transfer that "occur[] when property is transferred by operation of law, such as by means of an execution of judgment." *In re Dickson*, 655 F.3d 585, 593 (6th Cir. 2011) (citation modified); *see also In re Jones*, 226 F.3d 917, 921 (7th Cir. 2000) (noting that § 101(54) includes transfers made pursuant to state-court judgments). For instance, in the context of a judicial mortgage foreclosure, the Eighth Circuit had "no difficulty in concluding that under North Dakota law [the debtor] had an interest in the property at the time of its [foreclosure] sale, and at least until expiration of the [statutory] redemption period." *In re Hulm*, 738 F.2d 323, 326 (8th Cir. 1984). Concluding that transfers occurred throughout the foreclosure process, the court identified several property interests that the debtor parted with: the debtor's title interest, right to possession, right to the excess of the value of the property over the mortgage, and equity of redemption. *Id.*

---

F.4th 126, 161 (3d Cir. 2025) ("The Bankruptcy Code[] defines transfer in the broadest possible terms." (internal quotations omitted)); *In re Whitley*, 848 F.3d 205, 208 (4th Cir. 2017); *In re Veretto*, 131 B.R. 732, 737 (Bankr. D.N.M. 1991) ("[A] forfeiture of an equity interest under a real estate contract constitutes a transfer.").

So a transfer occurs under § 101(54)(D) when a state-recognized property interest—a right, claim, title, or legal share in something—is parted with, whether voluntarily or involuntarily.

**2.**

Here, a transfer occurred on March 31, 2022, under § 101(54)(D).[4]  None of the facts relevant to this issue are disputed.  On March 1, 2021, Reinhardt forfeited her property to the Treasurer because she hadn't paid her taxes.  *See* Mich. Comp. Laws § 211.78g(1).  But as the GPTA states, the only interest the Treasurer gained at that time was a right to seek a judgment of foreclosure; the Treasurer did "not acquire a right to possession or any other interest in the property."  *Id.* § 211.78(8)(b).  On February 18, 2022, the Michigan circuit court entered a foreclosure judgment against Reinhardt's property.  The judgment ordered that "[f]ee simple title to [Reinhardt's property] will vest absolutely in [the Treasurer] . . . without any further rights of redemption, if all [debts] are not paid to the County Treasurer on or before March 31, 2022."  R.3, Bankr. R., PageID 172.

Because Reinhardt didn't pay off the tax lien, the foreclosure judgment took effect on March 31.  On that day, title to the property vested absolutely in the Treasurer, and Reinhardt lost all rights to the property (including her equity of redemption and possession rights) except the right to claim remaining proceeds from the Treasurer's sale of the property.[5]  *See* Mich. Comp. Laws §§ 211.78g(1), 211.78k(5).  Contrary to the Treasurer's assertions, Reinhardt didn't lose her rights on February 18.  The judgment's use of "will vest"—as opposed to, for instance, "vests"—marks March 31 as the transfer of title, not February 18.  And nothing in the GPTA or the judgment indicates that Reinhardt lost title, her equity of redemption, or her right to possess before March 31.

---

[4]Because Reinhardt could've redeemed her property at any point during March 31, it may seem that April 1 should be viewed as the transfer date.  April 1 is also when the Treasurer received the right to possess the property. *See* Mich. Comp. Laws § 211.78g(1).  But the GPTA explicitly denotes March 31 as the effective date of the foreclosure judgment and when the delinquent taxpayer loses her rights in the property.  *Id.* § 211.78k(5).  In any event, the one-day difference between the transfer occurring on March 31 or April 1 would affect neither the outcome here nor the substance of either party's arguments.

[5]Because Michigan is a lien-theory state, Reinhardt had maintained legal title to the property despite the mortgage with PNC Bank.  *See Prime Fin. Servs. v. Vinton*, 761 N.W.2d 694, 703 (Mich. Ct. App. 2008).

Title to property is a property interest, so a transfer occurred under § 101(54)(D) on March 31 when Reinhardt involuntarily parted with that interest. *See In re Hackler*, 938 F.3d 473, 475–77 (3d Cir. 2019) (noting that, though the issue wasn't disputed by the parties, the transfer occurred when title to the property vested in the lienholder)*; In re RL Mgmt. Grp., LLC*, 2014 WL 197692, at *3 (Bankr. E.D. Mich. Jan. 10, 2014) (concluding that March 31 is the date of the transfer under the GPTA's tax foreclosure scheme). Before March 31, Reinhardt held title and could prevent foreclosure by paying off her tax debt through her equity of redemption. After March 31, the Treasurer held absolute title. "[T]he general rule is that the hallmark of a transfer is a change in the rights of the transferor with respect to the property after the transaction." 2 Collier on Bankruptcy § 101.54 (16th ed.) (citation modified). To say that a transfer didn't occur on March 31 ignores the clear and broad language of § 101(54)(D).

Despite the plain language of the foreclosure judgment and the GPTA, the Treasurer argues that the judgment vested title in him on February 18. To arrive at his conclusion, he says that the judgment foreclosed Reinhardt's equity of redemption on February 18, with the implication that Reinhardt lost title at the same time. And that left Reinhardt with only a statutory right of redemption and right to possess until March 31. But this argument conflates the statutory right of redemption with the equity of redemption. The equity of redemption is an equitable, pre-foreclosure-sale right that allows a debtor to avoid foreclosure by paying the outstanding debt. *Garcia v. Fed. Nat'l Mortg. Ass'n*, 782 F.3d 736, 740 (6th Cir. 2015); *see also Hall v. Meisner*, 51 F.4th 185, 190–95 (6th Cir. 2022). The statutory right of redemption is a post-foreclosure-sale right created by legislation that allows the debtor to regain property by paying the sale price. *Id.* This latter right, which the GPTA doesn't create, isn't at issue here. What matters is that the judgment and the GPTA set March 31 as the future date when Reinhardt would lose title (along with the ability to stop the foreclosure sale by paying off her debt).

The Treasurer misses the forest for the trees by focusing on labels as opposed to function. Regardless of the labels, we know that Reinhardt had several interests in her property until March 31, including possession. And if she had taken care of the tax delinquency by March 31, those rights would have continued as before. In the language of the February 18 foreclosure judgment, "[f]ee simple title . . . will vest" in the Treasurer "if all forfeited delinquent taxes . . .

are not paid to the County Treasurer on or before March 31, 2022." R.3, Bankr. R., PageID 172. So Reinhardt had alienable property rights between February 18 and March 31. Those rights expired on March 31, bringing what happened on that date within the meaning of a transfer under § 101(54)(D).

**B.**

But concluding that a "transfer" occurred on March 31 doesn't resolve the § 547(b)(4) lookback issue. We must also decide the perfection date.

The Code links the transfer date to the perfection date. *See* 11 U.S.C. § 547(e)(2). Transfers are "made" when the "transfer takes effect between the transferor and the transferee" if perfected within 30 days after the transfer. *Id.* § 547(e)(2)(A). So here, if the transfer was perfected within 30 days after March 31, the transfer was "made" on March 31.

For real property, a transfer is perfected "when a bona fide purchaser of such property from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest that is superior to the interest of the transferee." *Id.* § 547(e)(1)(A). So we look to Michigan law to determine whether the Treasurer perfected its interest within the 30 days provided by the Code. *In re Lee*, 530 F.3d 458, 466 n.6 (6th Cir. 2008) (citing *Fid. Fin. Servs. v. Fink*, 522 U.S. 211, 213 n.1 (1998)).

Michigan has a race-notice recording statute. *See* Mich. Comp. Laws § 565.29. When a conveyance of real property isn't recorded, that conveyance is void against a subsequent purchaser who records first and didn't have notice of the earlier conveyance. And the GPTA requires foreclosure judgments to be recorded with the county register of deeds. *Id.* § 211.78k(8). To determine when a purchaser of Reinhardt's property could no longer acquire a superior interest in title to the property as against the Treasurer, we look to when the Treasurer recorded the foreclosure judgment's transfer of title.

The foreclosure judgment vested fee simple title in the Treasurer on March 31, and the Treasurer recorded that judgment on April 5, 2022. There's nothing else in the record indicating how notice of the transfer of title might've been given to a bona fide purchaser between March

31 and April 5.  So a subsequent purchaser could've acquired a superior title interest until April 5.  And that means the March 31 transfer was perfected on April 5, within 30 days.  The transfer, therefore, was "made" on March 31.  Because Reinhardt petitioned for bankruptcy on June 10, the transfer was made within the 90-day lookback period under § 547(b)(4).  The bankruptcy court correctly ruled in Reinhardt's favor on this issue.

**IV.**

Next, we apply the "more than" test: Did the March 31 transfer enable the Treasurer to receive more than he would've received if the transfer hadn't happened and Reinhardt's bankruptcy were a Chapter 7 liquidation?   11 U.S.C. § 547(b)(5); *see In re Chattanooga Wholesale Antiques, Inc.*, 930 F.2d 458, 461 n.1 (6th Cir. 1991); *In re C-L Cartage Co.*, 899 F.2d 1490, 1493 (6th Cir. 1990).

On this question, we disagree with the bankruptcy court.  Reinhardt met her burden of showing her entitlement to summary judgment for the § 547(b)(5) requirement.  The 5% sales commission, which the Treasurer would receive from the August tax sale but wouldn't receive in the hypothetical Chapter 7 liquidation, makes the difference.

The "more than" test boils down to a comparison of two values.  *See Hackler*, 938 F.3d at 477–78; *In re Smith's Home Furnishings, Inc.*, 265 F.3d 959, 963 (9th Cir. 2001).  On one hand, we assess what the March 31 transfer enabled the Treasurer to receive.  On the other, we construct a hypothetical Chapter 7 liquidation—pretending the March 31 transfer never happened—and calculate what the Treasurer would've received.  *Chattanooga*, 930 F.2d at 464.  Then we compare.  If Reinhardt can show that the March 31 transfer enabled the Treasurer to receive more than he would've in the hypothetical liquidation, then she meets the § 547(b)(5) requirement and can avoid the transfer.

The bankruptcy petition date is the reference point for this comparison.  *In re Tenna Corp.*, 801 F.2d 819, 823 (6th Cir. 1986).  This rule has its origins in *Palmer Clay Products Co. v. Brown*, 297 U.S. 227 (1936).  There, the Supreme Court interpreted the predecessor provision to § 547(b) and viewed the petition date as the most practical way of

determining the "actual effect" of the transfer.  *Palmer Clay*, 297 U.S. at 229.  Section 547(b)(5) retained that approach.  *Tenna*, 801 F.2d at 823; 5 Collier on Bankruptcy § 547.03[7] (16th ed.).

So when constructing the hypothetical Chapter 7 liquidation, we ignore claims against the debtor or changes to a claim's status incurred after the debtor filed for bankruptcy.  *Tenna*, 801 F.2d at 823.  Instead, we evaluate claims as they existed on the date the debtor filed her bankruptcy petition.  *Id.*; *see also In re Royal Golf Prods. Corp.*, 908 F.2d 91, 95 (6th Cir. 1990); *In re Cumberland Molded Prods., LLC*, 431 B.R. 718, 723 (B.A.P. 6th Cir. 2010) ("The extent to which a claim is properly secured in a [C]hapter 7 case is determined as of the petition date.").

Because we're dealing with hypotheticals, some uncertainty inheres in the Chapter 7 analysis.  Predicting events and how trustees will administer estates "is not an exact science" and can require "an estimation of the value of all of the bankruptcy estate's assets, including such hard to determine values as disputed and contingent claims, the potential disallowance of claims (under § 502(d)), [and] the probability of success and value of causes of action held by the estate."  *In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000) (citation modified).  Despite the possible pitfalls of forecasting future events, our predictions shouldn't be boundless conjecture.  They must remain tied to the facts in the record.  *See Tenna*, 801 F.2d at 823 (recognizing that the estate's administrative expenses incurred during bankruptcy can be calculated with some degree of certainty for the hypothetical Chapter 7 liquidation analysis); *In re Tenderloin Health*, 849 F.3d 1231, 1245 (9th Cir. 2017) (holding "that courts may entertain hypothetical preference actions within section 547(b)(5)'s hypothetical liquidation when such an inquiry is factually warranted [and] supported by appropriate evidence").

And the other part of the § 547(b)(5) analysis—what the transfer enabled the Treasurer to receive—invites uncertainty and variability as well.  Unlike other cases where a foreclosure sale occurred before the petition date, *see In re Villarreal*, 413 B.R. 633, 635 (Bankr. S.D. Tex. 2009), or a foreclosure-by-sale wasn't in the cards, *see Hackler*, 938 F.3d at 475–76, the foreclosure sale mandated by the GPTA didn't happen before the petition date and never happened afterward.

So the key question in this case is whether we should—and if so, how we should—incorporate hypothetical post-petition events into this side of § 547(b)(5)'s "more than" comparison. On the petition date, the Treasurer held title to Reinhardt's property. But if we look just a little bit past the petition date, we can see that the Treasurer likely wouldn't have held title for much longer had Reinhardt not pursued avoidance of the transfer. Still, even though we can probably assume that the Treasurer would've complied with the GPTA and eventually given up title to Reinhardt's property, the value of what the Treasurer would receive is less certain. That's because a county can dispose of a given parcel of property in several ways under the GPTA. And what the Treasurer eventually receives is contingent on the decisions of the Treasurer and others, like Michigan government entities and potential purchasers. So in cases like this one where we don't have an actual sale, many questions about what might've happened post-petition arise. Would a government entity have swooped in and acquired the property for fair market value? Would the county treasurer have sold the property at the first public auction? What would it have sold for? Would the taxpayer have been able to recover the remaining proceeds? And if so, how much?

The parties offer several paths through this thicket. One path is to take a snapshot in time on the petition date. We'd ignore all post-petition events to arrive at the value of what the transfer enabled the Treasurer to receive. A second path is to factor in post-petition events to account for the conditions that the GPTA imposed on the Treasurer's receipt of Reinhardt's property—conditions that existed on the petition date. In other words, we'd predict how the GPTA's process likely would've played out if Reinhardt hadn't filed for bankruptcy.

With that said, we'll start the "more than" analysis by determining what the Treasurer would've received in a Chapter 7 liquidation had the March 31 transfer never happened. Then we'll determine what the March 31 transfer enabled the Treasurer to receive. And lastly, we'll compare.

**A.**

**1.**

In a Chapter 7 liquidation, "a trustee liquidates the debtor's assets and distributes them to creditors." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 455 (2017). The Code authorizes Chapter 7 trustees to sell property if the property's sale price is greater than the total value of all liens on the property. 11 U.S.C. § 363(f)(3); *see In re Burke*, 863 F.3d 521, 525 (6th Cir. 2017). Compared to a tax foreclosure sale, a trustee's sale in a Chapter 7 liquidation will typically generate value closer to the property's fair market value because the trustee, without the same time and resource constraints, can market the property and facilitate a sale to achieve the highest return. *See In re Gledhill*, 76 F.3d 1070, 1081 (10th Cir. 1996); *Villarreal*, 413 B.R. at 639; *see also Teed v. Thomas & Betts Power Sols., L.L.C.*, 711 F.3d 763, 769 (7th Cir. 2013) (describing the trustee's duty to maximize the estate's value). And a higher return can mean higher compensation for the trustee. *See* 11 U.S.C. § 326. Still, the trustee has a statutory duty to complete the liquidation as "expeditiously as is compatible with the best interests of parties in interest." *Id.* § 704(a)(1).

Distribution of the debtor's assets must follow the Code's priority list, with secured creditors at the top and low-priority creditors (including general unsecured creditors) at the bottom. *Czyzewski*, 580 U.S. at 457; *see* 11 U.S.C. §§ 725–26. Whether a creditor's claim is secured isn't a simple "yes" or "no" question—it's a matter of degree. *See* 11 U.S.C. § 506(a)(1). A creditor's claim falls into one of four categories: It's either completely unsecured (he has no underlying asset securing the debt), partially secured (the asset is valued less than the outstanding debt), fully secured (the asset is valued the same as the debt), or oversecured (the asset is more valuable than the debt).

Oversecured claims receive additional benefits. Section 506(b) of the Code allows the oversecured creditor to add to his secured claim (1) post-petition interest and (2) reasonable fees, costs, or charges up to the extent of the creditor's oversecurity. *Id.* § 506(b). For post-petition interest, the state's "applicable nonbankruptcy law"—which refers to any generally applicable law that isn't aimed solely at bankruptcy proceedings—sets the interest rate. *In re*

*Corrin*, 849 F.3d 653, 658 (6th Cir. 2017); *see* 11 U.S.C. § 511(a). And for "fees, costs, or charges," the creditor receives them from the bankruptcy estate only if they're provided for by the state law "under which [the creditor's] claim arose" and are reasonable. 11 U.S.C. § 506(b); *see also* 4 Collier on Bankruptcy § 506.04[3] (16th ed.). Importantly, post-petition interest and costs join the oversecured claim, with interest accruing until payment of the claim. *See Rake v. Wade*, 508 U.S. 464, 468, 470–71 (1993); *In re Leatherland Corp.*, 302 B.R. 250, 257–58 (Bankr. N.D. Ohio 2003); *In re Dow Corning Corp.*, 244 B.R. 678, 684 (Bankr. E.D. Mich. 1999). And this is true whether the creditor holds a consensual or nonconsensual lien. *See United States v. Ron Pair Enters.*, 489 U.S. 235, 237 (1989).

Here, the parties stipulated that, before including any § 506(b) benefits, the value of the Treasurer's claim on the petition date was $5,845. And his claim was secured by property with a fair market value of over $70,000. So the Treasurer was oversecured—significantly. The Treasurer's oversecured status would entitle him to the § 506(b) benefits. And though we ignore claims that arose after the bankruptcy petition date, *Tenna*, 801 F.2d at 823, the rights to payment provided to an oversecured creditor under § 506(b) exist on the petition date by operation of the Code. So we must consider § 506(b) when constructing the hypothetical Chapter 7 liquidation. Just as administrative expenses "are a constant element in all bankruptcy proceedings and can be derived with some degree of certainty" for the hypothetical Chapter 7 liquidation, the payments provided by § 506(b) can also be predicted with enough certainty. *Id.*; *see In re Keenan*, 364 B.R. 786, 803–04 (Bankr. D.N.M. 2007) (approximating the length of time of a hypothetical Chapter 7 liquidation).

Because the Treasurer was oversecured, § 506(b) would've entitled him to the post-petition interest that would've accrued during the hypothetical bankruptcy proceedings under Michigan's applicable nonbankruptcy law. *See* 11 U.S.C. § 506(b). And here, the GPTA is that law, imposing interest at a non-compounded 1.5% monthly rate. Mich. Comp. Laws §§ 211.78a(3), 211.78g(3)(b).

For fees, costs, or charges under § 506(b), we look to the state law under which the Treasurer's claim arose—also the GPTA. But the GPTA doesn't authorize any fees, costs, or charges that would apply to the hypothetical Chapter 7 liquidation. The GPTA does use

proceeds from the foreclosure sale to send a 5% sales commission to the county. *Id.* § 211.78t(9). But in this hypothetical, the March 31 transfer never happened, so the foreclosure sale never happened. That means the Treasurer doesn't receive a 5% sales commission.

The GPTA also provides that the minimum bid for tax-foreclosed property may include expenses incurred by the county in connection with the tax foreclosure process. *Id.* § 211.78m(16)(c). And the GPTA tells the county to withhold all other fees and expenses related to the foreclosure and sale of the property from the taxpayer's remaining proceeds. *Id.* § 211.78t(12)(b)(ii). But the county withholds these expenses from the taxpayer only after the transfer of title and only if the foreclosed property is sold, not before or without a sale. *Id.* § 211.78m(1)–(5). Again, because the Treasurer never received title to the property nor sold it at auction in this hypothetical, the Treasurer's Chapter 7 claim wouldn't include these fees.

In the bankruptcy court, the parties agreed that the Treasurer's claim would be paid in full in the hypothetical Chapter 7 liquidation. But they disputed what the value of the Treasurer's claim would be. Using a liquidation sale price of $76,700, the midpoint of the range of her property's fair market value, Reinhardt concluded that a Chapter 7 liquidation would've resulted in full payment to all claims—the Treasurer's $5,845 claim, PNC Bank's $8,826 claim, and the unsecured creditors' $8,965 claims—with $13,696 remaining in the bankruptcy estate after accounting for liquidation-sale costs and the equity in Reinhardt's property exempt from distribution. Reinhardt, however, didn't include the Treasurer's right to post-petition interest under § 506(b) as part of his claim, which, as we explained above, is incorrect. In addition, we question her use of the midpoint of the property's fair market value. Though a trustee's sale typically generates value closer to the property's fair market value than a foreclosure sale, using the midpoint of the property's fair market value was an aggressive estimate.

The Treasurer didn't concede that the property would've sold within the market analysis's range of $73,500 to $79,900, but he nonetheless agreed that, even under the low end of that range, his claim would've been paid in full. And he included post-petition interest and costs under § 506(b) as part of his claim. But though the Treasurer correctly included post-petition interest, he shouldn't have included the § 506(b) "fees, costs, or charges" under the GPTA because he wouldn't have incurred those expenses if the March 31 transfer hadn't happened.

So correcting the parties' views, we're left with the Treasurer receiving his $5,845 claim in full plus post-petition interest from the hypothetical liquidation. Neither party presented an actual estimate of the post-petition interest nor any facts, such as the expected pendency of the hypothetical Chapter 7, that could be used to estimate that value. But the post-petition interest's precise value ends up not being material to the § 547(b)(5) issue in this case, for reasons we discuss below.

**2.**

We now turn to the other side of the "more than" comparison: what the March 31 transfer enabled (or would've enabled) the Treasurer to receive. As discussed already, we have two approaches to determine the value of what the transfer enabled the Treasurer to receive. First, we could take a snapshot in time on the petition date and ignore post-petition events when determining what the transfer enabled the Treasurer to receive. Second, we could consider the conditions imposed on the Treasurer's receipt of the property by predicting how the GPTA's process likely would've played out post-petition.

Start with the snapshot approach. On the petition date, the Treasurer held Reinhardt's property in fee simple title because of the March 31 transfer. The property's fair market value was between $73,500 and $79,900, and the minimum bid was $11,055. But as of the petition date, the property's value wasn't yet subject to the conditions of a foreclosure sale—for instance, if a state or local government entity stepped in to purchase the property, the purchase price would be the greater of the minimum bid or fair market value. Mich. Comp. Laws § 211.78m(1). And though the Treasurer contends that the value of his holding title to the property was offset by Reinhardt's right to remaining proceeds, as of the petition date Reinhardt had filed only a notice of intent to claim proceeds. She'd receive the right to the proceeds only after filing a claim, proving her interest, and obtaining a court order for the county to distribute the proceeds. *Id.* § 211.78t(9). So taking a snapshot on the petition date, the transfer enabled the Treasurer to receive the fair market value of Reinhardt's property, between $73,500 and $79,900. Because this amount is substantially "more than" $5,845 plus post-petition interest, Reinhardt would satisfy the § 547(b)(5) requirement under this approach.

Though the snapshot approach is easy to apply, it's unrealistic here because it doesn't accurately convey the value of what the March 31 transfer enabled the Treasurer to receive. Yes, the Treasurer held title on the petition date. But under Michigan law, the Treasurer's possession is a way station. The Treasurer was duty-bound to dispose of the property to satisfy the tax deficiency. So holding title on the petition date was, in some sense, illusory. Or at least an incomplete picture of what the transfer enabled the Treasurer to receive because it requires us to ignore how the GPTA limited the transfer's value to the Treasurer.

Having rejected the snapshot approach, we turn to the approach where we consider post-petition events as contemplated by the GPTA. And it is the approach that must be adopted if we are to follow § 547(b)(5). On the petition date, the GPTA imposed conditions on the Treasurer's receipt of Reinhardt's property that potentially limited the transfer's value to the Treasurer. So we account for these future events to help us calculate the value of the property at a point in time (the petition date). And predicting how the GPTA's process would've played out, when sufficiently constrained by the facts in the record, is consistent with the general approach to evaluating bankruptcy proceedings on either side of the "more than" comparison.[6] *See, e.g.*, *Tenna*, 801 F.2d at 823 (recognizing that bankruptcy administrative expenses should be considered for the hypothetical Chapter 7 liquidation); *Tenderloin Health*, 849 F.3d at 1245 (recognizing that a trustee's hypothetical avoidance action during bankruptcy can be considered). Determining the result of bankruptcy proceedings often requires, for instance, predicting how a trustee will administer the bankruptcy estate or resolving contingent claims. *See Tenderloin Health*, 849 F.3d at 1237–38.

To be sure, the parties dispute some facts regarding what might've happened had the foreclosure sale process taken place in the absence of the bankruptcy filing. But enough is undisputed for us to find that Reinhardt carried her burden of satisfying the "more than" test.

---

[6]In this way, the approach is similar to the way that accountants or financial analysts would calculate present value by incorporating discounted, future cash flows. *See, e.g.*, *Tri Cnty. Wholesale Distribs., Inc. v. Labatt USA Operating Co.*, 828 F.3d 421, 431 (6th Cir. 2016); *In re Glob. Technovations, Inc.*, 431 B.R. 739, 765 (Bankr. E.D. Mich. 2010). So distinguishing between the two approaches by calling the first one the snapshot approach is imperfect because this approach also involves determining a property's value (or at least a range of values) at a single point in time. The difference is that the snapshot approach ignores how statutorily required events just over the horizon affect petition-date value.

While drawing inferences in the Treasurer's favor for disputed facts, we can conclude that the transfer enabled the Treasurer to receive more than he would've in the hypothetical Chapter 7 liquidation.

Though there's some uncertainty in looking at post-petition events to determine what the transfer enabled the Treasurer to receive, this uncertainty is mitigated here because the parties largely agree on how events would've played out. Uncertainty arises because post-petition events don't occur in a vacuum. They occur, and would've occurred, with knowledge of the bankruptcy and later adversary complaints. So parties can make decisions that are advantageous to their positions in a pending avoidance action. *Cf. Tenna*, 801 F.2d at 823 (finding that it would be "inconceivable and illogical" if courts allowed the estate's trustee to control whether a transfer was preferential by looking to when payments were made post-petition). And these decisions might give the false impression that certain outcomes were likely had bankruptcy not occurred.

But we largely avoid this problem. Neither party contends that Reinhardt's property would've been scooped up earlier by a government entity, bundled with other properties in August, or sold at a second auction rather than being sold individually at its first offering in August. So we're left with one central dispute: whether Reinhardt would've recovered proceeds from the sale.

On March 31, the Treasurer obtained title to property with a fair market value of around $76,700. But if no government entity stepped in, then the GPTA obligated him to offer Reinhardt's property for sale at a public auction. To determine what the Treasurer would receive, ideally we'd know what the property sold for at the August 2022 tax sale. But the Treasurer withdrew the property from the sale in response to the bankruptcy filing.

Still, we know enough. We know that Reinhardt preserved her right to claim remaining proceeds by filing a timely notice. We know that the Treasurer didn't bundle any properties at the August sale. And the parties stipulated that the property's minimum bid at the August sale would've been $11,055.

Importantly, the Treasurer didn't dispute that the property would've sold for considerably more than the minimum bid—after all, the fair market value was over six times the minimum bid. Reinhardt estimates that the property would've sold for around $37,000. And the Treasurer hasn't disputed Reinhardt's estimate nor provided one of his own. Instead, his argument to the bankruptcy court relied on assuming (without conceding) that the property would've sold for $73,500. And he doesn't provide an estimate or dispute Reinhardt's on appeal.

So we know that had the property sold at a price close to market value, or indeed even half of that, as Reinhardt suggests, the proceeds would've been divided in the following way. The Treasurer would've received the $11,055 minimum bid. That minimum bid amount would've included the delinquent taxes, interest and penalties, and other fees including legal fees. Mich. Comp. Laws § 211.78m(16)(c). Again, the Treasurer left undisputed Reinhardt's estimate for the property's tax sale price. And he certainly didn't contend that the sale price would've been anywhere near the minimum bid. So the tax sale would result in an excess over the minimum bid. And from that excess, the Treasurer retains a 5% sales commission.[7] *See id.* § 211.78(t)(12)(b). Then, Reinhardt would've successfully recovered the remaining proceeds.[8]

Regardless of the precise August sale price, we can be confident that the Treasurer would've received "more than" he would've received in the hypothetical Chapter 7 liquidation. Taking a simplistic view, the minimum bid, on its face, would've resulted in twice the amount of money being paid to the Treasurer (or perhaps his designees) compared to the hypothetical

---

[7]Of course, if the property sold for exactly the minimum bid, then there wouldn't be a 5% sales commission for the Treasurer to retain. But the sale price doesn't need to be much higher than the minimum bid for the Treasurer to retain the full 5% authorized by the GPTA. If the property sold for at least $11,637, the Treasurer would retain a full 5%. This isn't an issue, however, because the Treasurer doesn't dispute that the sale price would've been much higher than the minimum bid.

[8]Reinhardt cautions us that there's reason to be skeptical she would've ever received the remaining proceeds. In 2021, Bay County sold over 30 foreclosed properties at auction. Only six claimants filed timely notices of intent to claim remaining proceeds, and none of those six followed up on that notice with a filing to recover the proceeds. But without details on why the 2021 claimants didn't pursue an opportunity to recover the remaining proceeds, and without anything in the record giving us reason to believe that Reinhardt would've followed the same path, we're comfortable inferring that Reinhardt would've recovered the remaining proceeds. The Michigan Supreme Court has found that the right to remaining proceeds isn't just a statutory right, but a long-recognized common-law right that is "entitled to as much protection" as any other property right and "constitutionally protected by [Michigan's] Takings Clause." *Rafaeli*, 952 N.W.2d at 459 n.101, 460. We're confident that Michigan courts would've ensured compliance with constitutional and statutory requirements throughout the tax foreclosure process.

Chapter 7 liquidation. Of course, the difference represents fees that the Treasurer would've necessarily spent as part of the sale process and post-petition interest that would accrue at the same rate as it would during a bankruptcy. And it might be inaccurate to say that the March 31 transfer enabled the Treasurer to receive fees that merely compensate him for expenses incurred because of the transfer.

But setting fees and interest aside, the Treasurer still retains the 5% sales commission.[9] This 5% simply comes off the top of the sale price and goes directly to the Treasurer. And though certain fees and interest might have analogs in the Chapter 7 liquidation process, creditors in bankruptcy don't receive sales commissions. The 5% sales commission ensures that the March 31 transfer enabled the Treasurer to receive more than he would've if the transfer hadn't happened and the case was a Chapter 7 bankruptcy.

Simply put, the Treasurer's Chapter 7 claim plus a 5% sales commission is more than the Treasurer's Chapter 7 claim alone. So Reinhardt is entitled to summary judgment on the § 547(b)(5) issue.

Though the value of post-petition interest in the hypothetical Chapter 7 liquidation is unclear from the record, its precise value isn't material to the outcome of this case. Neither party estimated the post-petition interest's value. But the Treasurer can't genuinely assert that the hypothetical Chapter 7 proceedings would be pending long enough for the interest to bridge the gap between what the Treasurer would receive in the two scenarios that the "more than" test tells us to compare. Taking Reinhardt's August sale estimate of around $37,000, it would've taken a nearly two-year Chapter 7 liquidation process for post-petition interest to match the 5% sales commission. The Treasurer doesn't provide any factual basis for us to believe that a Chapter 7 liquidation of Reinhardt's estate would be so unusually and exceptionally long.

---

[9]Outside of bankruptcy, the 5% sales commission, which Michigan intended to incentivize county treasurers to get the best deal possible, would benefit the tax debtor as well as the Treasurer if the commission serves its intent. Indeed, the Treasurer speculated that Reinhardt (or the estate) would've been better off under a market value foreclosure sale than under a Chapter 7 liquidation. We have our doubts—after all, the trustee owes a fiduciary duty to the estate in addition to having a financial incentive to disburse as much money to the creditors as possible. *See* 11 U.S.C. § 704(a).

**B.**

**1.**

Resisting this conclusion, the Treasurer maintains that there's more than meets the eye to § 547(b)(5)'s use of "more than."  He says that a transfer, to satisfy the "more than" test and allow avoidance, must've enabled the creditor to either get paid at a higher priority or receive a higher percentage of its claim relative to other creditors within its class.  And because he'd receive 100% of his claim in both scenarios, he didn't receive "more than."  But this argument, in effect, asks us to return to the pre-1978 definition of a preferential transfer by inserting words into the Code that are no longer there.

Before Congress enacted § 547(b)(5), federal law looked at preferential transfers as the Treasurer does now.  It classified a transfer as preferential if it enabled a creditor "to obtain a greater percentage of his debt than any other such creditors of the same class."  Bankruptcy Act of 1898, Pub. L. No. 55-541, 30 Stat. 544, 562 (repealed 1978).  But in 1978, Congress removed any mention of percentages or creditor classes.  Now, § 547(b)(5) simply asks whether the transfer enabled the creditor to receive more than he would've in a Chapter 7 liquidation. Though the creditor's class still matters, it matters only because it can affect what the creditor would receive.

None of the Treasurer's cited cases persuade us.  The Treasurer points to *Palmer Clay* to support his interpretation of § 547(b)(5).  In that case, the parties disputed whether the Bankruptcy Act of 1898 obligated courts to evaluate a purported preferential transfer based on the date of the transfer or the bankruptcy petition. *Palmer Clay*, 297 U.S. at 229.  The Supreme Court held that the petition date was the correct benchmark. *Id.*  The Treasurer says *Palmer Clay* supports his position because the opinion described a preference as "[a] payment which enables the creditor 'to obtain a greater percentage of his debt than any other of such creditors of the same class.'" *Id.* (quoting the Bankruptcy Act of 1898).  But *Palmer Clay* was quoting and interpreting language from the pre-1978 version of the Code, and Congress removed that quoted language when it codified § 547.  So that case doesn't control our interpretation.

The Treasurer next points to cases from this Court, *Tenna* and *Royal Golf*. In *Tenna*, we held that § 547(b) retained the *Palmer Clay* rule by setting the bankruptcy petition date as the correct date for constructing the hypothetical Chapter 7 liquidation. 801 F.2d at 822–23. As the Treasurer points out, *Tenna* identified that when a bankruptcy court "mak[es] the § 547(b) determination, it determines the priority status of all creditors as 'if' the Chapter 7 liquidation had been made." *Id.* at 821. But there, we simply recognized that the priority status of the creditor will, of course, help determine the hypothetical distribution to the creditor. Nothing in that case suggests that § 547(b)(5) cares only about the creditor's position relative to other creditors within its class.

The Treasurer's use of *Royal Golf* doesn't work either. There, we addressed whether a bankruptcy court had based its hypothetical Chapter 7 analysis on the bankruptcy petition date. *Royal Golf*, 908 F.2d at 94–95. We held that the bankruptcy court's failure to explicitly explain its hypothetical Chapter 7 analysis was a harmless error because it implicitly based its analysis on the petition date and reached the correct result. *Id.* at 95. The Treasurer clings to language from *Royal Golf* where we noted that the *Tenna* court "read *Palmer Clay Products* as solely concerned with the effect of the alleged preferential transfer on the equality of distribution among the bankruptcy creditors." *Id.* But again, that reading of *Palmer Clay* is correct because *Palmer Clay* was interpreting the Bankruptcy Act of 1898, not the modern § 547. And just like *Tenna*, we weren't concerned with creditor class in *Royal Golf*. We addressed only whether the bankruptcy court had used the petition date as the basis for the hypothetical Chapter 7 analysis. So neither *Tenna* nor *Royal Golf* robs § 547(b)(5) of its plain meaning.

When "the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *Ron Pair*, 489 U.S. at 241 (citation modified). Here, § 547(b)(5) carries an unambiguous command. "More than" means just that. And the Treasurer doesn't point to any other provision of the Code, or another statute for that matter, in which "more than" wanders from its plain meaning. Though the priority class of each claim matters in the "more than" analysis, nothing in the Code limits the meaning of "more than" to refer only to whether the transfer enabled the creditor to receive distribution at a higher priority or a greater percentage within its priority class.

**2.**

We recognize that a pre-petition transfer to a fully secured creditor isn't usually a preferential transfer.  *C-L Cartage*, 899 F.2d at 1493.  But we reject a per se rule that would immunize property tax foreclosures from preferential status even when, as here, the creditor is drastically oversecured.  Nothing in the Code prescribes such rigidity.

Still, courts have taken opposite views on § 547(b)'s application to property tax foreclosures.  Some courts have relied on the Supreme Court's holding in *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994), to find property tax foreclosures per se non-preferential.  *See, e.g.*, *In re Pulcini*, 261 B.R. 836, 844–45 (Bankr. W.D. Pa. 2001); *RL Mgmt. Grp.*, 2014 WL 197692, at *6.  But others have found property tax foreclosures preferential, rejecting the view that *BFP* foreclosed its conclusion or counseled against it.  *See, e.g.*, *Hackler*, 938 F.3d at 478–80; *In re Andrews*, 262 B.R. 299, 303–04 (Bankr. M.D. Pa. 2001).  We take the latter view.

*BFP* addressed 11 U.S.C. § 548, which deals with fraudulent transfers.  Section 548 labels a transfer fraudulent—and grants the trustee power to avoid it—if, among other things, the transfer yielded "less than a reasonably equivalent value" for the property.  11 U.S.C. § 548(a)(1)(B)(i).  So to determine whether § 548 classifies a transfer as fraudulent, courts assess the value of what was transferred.  In *BFP*, the debtor had filed for Chapter 11 bankruptcy and sought to avoid the transfer of the home as fraudulent after it had been sold in a state-law-compliant foreclosure sale.  511 U.S. at 533.  In the debtor's view, because the home was worth $725,000 but sold for only $433,000 at the foreclosure sale, the sale was a fraudulent transfer.  *Id.* at 534.

The Supreme Court disagreed.  It held that, assuming compliance with state foreclosure law, "reasonably equivalent value" meant the forced-sale price rather than, for instance, fair market value.  *Id.* at 545.  In reaching this conclusion, the Supreme Court noted that though "fair market value" appeared elsewhere in the Code, it didn't appear in § 548.  *Id.* at 537.  It recognized that a property sold at a mortgage foreclosure sale is simply worth less than it would be in normal market conditions.  *Id.* at 537–38.  So for § 548's purposes, the foreclosure sale price was the home's value.  In so holding, the Supreme Court effectively eliminated the

possibility of a mortgage foreclosure sale constituting a fraudulent transfer unless the sale was intentionally fraudulent or violated applicable state law. *Id.* at 545–46.

Our analysis doesn't conflict with *BFP*. To start, *BFP* interpreted the fraudulent transfer provision, § 548, not the preferential transfer provision, § 547. The term "reasonably equivalent value" doesn't appear in § 547. And the Court expressly limited its § 548 reasoning to mortgage foreclosures, acknowledging that "considerations bearing upon other foreclosures and forced sales (to satisfy tax liens, for example) may be different." *Id.* at 537 n.3. What's more, our analysis doesn't conflict with the way the Court resolved the ambiguity in determining a home's value. The Court grappled with the fact that a home's value is contingent on conditions surrounding the sale. So a home's fair market value doesn't reflect its value under the forced-sale conditions of a mortgage foreclosure. *Id.* at 537–39. Here, unlike in *BFP*, we don't have the benefit of the property's actual sale price at a foreclosure sale. But even so, in our predictive mode of analysis, we don't rely on the fair market value of Reinhardt's property when making the "more than" comparison. When looking to what the transfer enabled the Treasurer to receive, we recognize that the property's value wasn't its fair market value. We look to the conditions surrounding the Treasurer's possession of the property on the petition date, which leads us to estimates for what the property would've sold for at the tax sale. As for the hypothetical Chapter 7 liquidation, the Treasurer didn't dispute before the bankruptcy court that he would've recovered his claim in full, meaning that the liquidation sale price of Reinhardt's property wasn't a material dispute.

Still, some courts have found *BFP* persuasive in § 547 cases involving property tax foreclosures. *See, e.g.*, *RL Mgmt. Grp., LLC*, 2014 WL 197692, at *6. *BFP* expressed concerns that subjecting mortgage foreclosures to avoidance under § 548 would place all property purchased at a foreclosure sale "under a federally created cloud" and impede the state's interest in ensuring certainty of title. *BFP*, 511 U.S. at 544. But the Supreme Court voiced its concerns only after concluding that § 548's use of "reasonably equivalent value" wasn't clear textual guidance. *Id.* at 542–43. Here, we view § 547(b)(5) as clear and unambiguous. So to the extent that § 547(b) creates a federal cloud over some property tax foreclosures, federal law commands

that result. *See id.* at 546 ("The Bankruptcy Code can of course override [contrary state law or historical practice] by implication when the implication is unambiguous.").

And we aren't convinced that our ruling will upset the applecart by disrupting Michigan's tax foreclosure process, as the Treasurer warns. Section 547 still requires preferential transfers to meet other requirements, such as being made when the debtor was insolvent. 11 U.S.C. § 547(b)(3). And not all taxpayers subject to tax foreclosure will file for bankruptcy. The bankruptcy process is long and expensive, and federal law imposes harsh penalties for its abuse. *See, e.g.*, 18 U.S.C. §§ 152, 157.

Regardless, "no amount of policy-talk can overcome a plain statutory command." *Niz-Chavez v. Garland*, 593 U.S. 155, 171 (2021). Exempting property tax foreclosures from § 547(b) is a job for Congress, not us. And Michigan's legislature can always choose to adopt different procedures that better fulfill its policy goals in the shadow of federal bankruptcy law.

Finally, we note some limitations to this opinion. First, the outcome of the § 547(b) analysis for tax foreclosures depends on the state's chosen method for collecting delinquent property taxes and the particulars of the case. Michigan's foreclosure scheme relies on selling the property, but a system that relies on selling the lien or selling the interest might lead to a different outcome. *Cf. In re Smith*, 811 F.3d 228, 237–38 (7th Cir. 2016) (describing three methods states generally use to collect delinquent property taxes). And we aren't saying that every tax foreclosure under the GPTA results in a preferential transfer. For instance, if a foreclosed property sold at or below the minimum bid, the county wouldn't receive the sales commission.

Second, our finding that the March 31 transfer is preferential does nothing to harm the Treasurer's secured status in Reinhardt's continued Chapter 13 proceedings. Once avoided, the property will return to Reinhardt's bankruptcy estate and the Treasurer will retain the secured tax lien, with the benefits that the Code provides to such claims. *See, e.g.*, 11 U.S.C. § 1325(a); *Rake*, 508 U.S. at 468 (noting the general recognition that post-petition interest provided to oversecured claims under § 506 accrues until the plan's effective date). And as Reinhardt's Chapter 13 plan sets out, she intends to pay the Treasurer in full and before any other creditor.

**V.**

Reinhardt established that the transfer was preferential under 11 U.S.C. § 547(b)(4) and § 547(b)(5) as a matter of law. So we reverse the district court's judgment affirming the bankruptcy court's grant of the Treasurer's summary-judgment motion and denial of Reinhardt's.